David D. PETERSEN, Claimant
and Appellant,

v.

HINKY DINKY, Employer and Appellee,

and

INA/CIGNA, Insurer and Appellee.

No. 18281.

Supreme Court of South Dakota.

Considered on Briefs Oct. 5, 1993.

Decided April 20, 1994.

Scott G. Hoy of Hoy Law Office, Sioux Falls, for claimant and appellant.

Comet Haraldson of Woods, Fuller, Schultz & Smith, Sioux Falls, for appellees.

LOVRIEN, Circuit Judge.

This is an appeal by David D. Petersen (Petersen) from a judgment of the circuit court wherein it affirmed a decision of the South Dakota Department of Labor, Division of Labor and Management (Department), in favor of Hinky Dinky (Employer) and its worker's compensation carrier, INA/CIGNA (Insurer), denying Petersen's claim for a permanent total disability rating under the odd-lot doctrine. We affirm.

## PROCEDURAL HISTORY

Petersen's claim was first heard by the Department in September of 1987. The Department rendered its decision in June of 1988, and issued a preliminary Order on July 27, 1988. Since the Department found that Petersen had the potential to either return to work or to attend a vocational rehabilitation program, it ordered that he be provided, at Employer's expense, access to a pain management clinic, a work hardening program, chemical dependency treatment, a psychological evaluation, vocational counseling and, if necessary, a rehabilitation program and that he be paid permanent partial disability benefits of 22.5% whole person as of that date. The Department retained jurisdiction and delayed a decision regarding permanent total disability benefits until all programs were completed by Petersen.

On March 2, 1992, the Department held a second hearing to determine whether Petersen was entitled to permanent total disability benefits. The Department issued its decision on July 24, 1992, denying Petersen's claim. The Department denied a motion to reconsider on September 29, 1992. The circuit court affirmed the Department's decision on February 1, 1993.

## ISSUE

WHETHER THE DEPARTMENT'S DECISION DENYING PETERSEN PERMANENT TOTAL DISABILITY BENEFITS UNDER THE ODD-LOT DOCTRINE WAS CLEARLY ERRONEOUS IN LIGHT OF THE ENTIRE EVIDENCE PRESENTED.

## FACTS

Because the history of this case spans more than a decade, an extensive review of the facts is necessary to lay a proper foundation for our decision.

Petersen is presently thirty-five years old and lives in Sioux Falls, South Dakota. He has a high school education. The majority of his work experience was obtained in the grocery store business. In November of 1982, at the age of twenty-four, Petersen suffered an injury to his lower back arising out of and in the course of his employment with Employer. After a short period of conservative care and recuperation, Petersen returned to work with Employer.

In March of 1983, Petersen re-injured his back while on the job. Approximately four days later, Petersen was admitted to McKennan Hospital under the supervision of his family physician, Dr. Neal Elkjer. Dr. Elkjer prescribed physical therapy and medication for Petersen upon his release from McKennan.

In August of 1983, Dr. Elkjer referred Petersen to Dr. Dennis Johnson, an orthopedic surgeon practicing in Sioux Falls. Dr. Johnson hospitalized Petersen and treated him with chymopapain injections at the L4–5 and L5–S1 levels of the lumbar spine. This treatment was ineffective in relieving his pain. Between his release from the hospital in August of 1983 and mid-December of 1985, Petersen was seen and evaluated by five other physicians in addition to Drs. Elkjer and Johnson.[1]

On December 18, 1985, Dr. Gail Benson performed a posterolateral fusion at the L3–5 and S1–2 levels of the lumbar spine with the implantation of a luque loop wiring fixation to provide stability. Following surgery, Peter-

1. These included neurologist, Dr. O.V. Opheim, clinical psychologist, Dr. Bill H. Arbes, and or-

thopedic surgeons, Dr. Robert Giebink, Dr. P.K. Rodman, and Dr. Gail Benson.

sen continued treatment with Drs. Elkjer and Benson. In March of 1987 he began therapy at the Midwest Back Center in Sioux Falls.

In June of 1987, following the therapy program, a functional capacities assessment (FCA) was performed by Philip C. Moe, a physical therapist and clinical supervisor at the Midwest Back Center. Mr. Moe concluded that the FCA he conducted on Petersen was invalid because, in his view, Petersen intentionally tried to manipulate the results. Four years later, in June of 1991, two additional FCAs were performed, one by Dr. Dong Cho, and the other again by Mr. Moe. Both of these FCAs were considered valid.

From 1983 to 1987, Petersen's treating physicians recognized that there was a possible psychological component to his physical condition. Clinical psychologist Dr. Bill Arbes examined Petersen five times between April 1984 and April 1986. Dr. Arbes diagnosed Petersen as having an adjustment disorder with mixed emotional features. He concluded that Petersen's condition was treatable and that he should begin a physical therapy or pain management program. Dr. Arbes saw no evidence that Petersen was malingering, but he was disturbed by Mr. Petersen's unwillingness to follow through on recommended activities.

Petersen also saw psychiatrist Dr. David Bean in February of 1987. Dr. Bean found no psychiatric disorder at that time. However, Dr. Bean evaluated Petersen again in September of 1987, at the request of Petersen's attorney, and diagnosed Petersen with an adjustment disorder with mixed emotional features of anxiety and depression. Dr. Bean concluded that this disorder was a treatable condition of a mild to moderate degree, being secondary to his physical condition.

A third opinion was given by psychiatrist Dr. Daniel Kennelly in October of 1987. Dr. Kennelly found that Petersen suffered no psychological impairment, but concluded that Petersen exaggerated his symptoms and did not truthfully answer certain questions posed during the evaluation. None of the three doctors who evaluated Petersen psychologically felt that his psychological impairment was serious enough to keep him from being gainfully employed.[2]

In April of 1986, Dr. Benson, the orthopedic surgeon who performed Petersen's luque loop surgery, released Petersen to sedentary or light duty work with certain restrictions on lifting, bending, stooping, etc., and recommended a vocational rehabilitation program. Dr. Benson felt that a solid fusion had been achieved and assigned a 20 to 25% physical impairment rating. Again, in September of 1991, Dr. Benson released Petersen to work within the limits of the 1991 FCA. Several of Petersen's other treating physicians either released him for light duty work, a vocational rehabilitation program, or recommended a pain clinic.[3]

2. At the initial hearing in 1987, Petersen took the position that a combination of his physical and psychological conditions rendered him permanently and totally disabled. However, after the 1992 hearing, the Department stated in its Decision that Petersen was no longer making that claim and that it was not supported by the evidence at that time. Rather, Petersen was arguing that his pain, combined with his functional limitations placed him in the odd-lot category. A thorough review of the transcript from the 1992 hearing reveals that the vast majority of Petersen's direct testimony focuses on his pain and functional limitations. No significant testimony from any of the witnesses evidenced that Petersen suffered from a psychological condition which would contribute to render him permanently and totally disabled.

3. Dr. Johnson opined that Petersen could return to sedentary work or schooling with limitations on lifting. He also limited Petersen's bending, stooping, climbing, and crawling and recommended that Petersen be allowed to frequently change positions between sitting and standing. Dr. Johnson never saw Petersen after the luque loop surgery in December of 1985, and it appears from the record that some animosity developed between he and Petersen after he reported seeing Petersen running in the DakotaDome and a nurse on his staff allegedly saw Petersen dancing at a night club. Both of these incidents allegedly took place prior to the luque loop surgery, and Petersen denies that he was ever running in the DakotaDome. He does however, admit that he was dancing, stating that he was only "slow dancing" for a short period of time.

Dr. Cho testified that claimant could return to work within the limitations of the valid FCA. He recommended a program of weights and exercises and chronic pain rehabilitation at McKennan Hospital and then light duty work or a rehabilitative program.

The Department's preliminary order provided that Petersen enroll in a comprehensive back pain and work-hardening program. Accordingly, in January of 1989, Petersen was evaluated by Dr. Gary Dickinson for enrollment in the Chronic Pain Rehabilitation Program at McKennan Hospital.

It was initially decided that Petersen be placed in the program for an extended trial evaluation to determine whether he would be capable of fully involving himself in the program. Petersen made very little progress during the first three weeks of the trial evaluation, but improved enough during the final week so that he was accepted into the full program.

Dr. Dickinson stated in a letter to Petersen's original attorney that "we felt that he could progress to the point where he might actually be able to be employable again." Petersen however, declined participation in the program.[4]

In January of 1991 Petersen was evaluated by vocational rehabilitation specialist, Richard Ostrander. Mr. Ostrander interviewed Petersen, reviewed his medical history, conducted certain tests and performed a transferable skills analysis and labor market survey. Mr. Ostrander provided Petersen with a list of ten potential employers having jobs which allowed for change of position.

Petersen approached some of these employers, but was unsuccessful in finding employment. Petersen also conducted his own personal job search from October 28, 1991 through November 7, 1991. Approximately forty to fifty employers were contacted by Petersen. Despite his efforts, no employment was secured.

Between the first and second hearings, Petersen was not employed. He neither attended nor enrolled in any educational retraining program. However, under the supervision of Dr. Elkjer, Petersen successfully overcame his chemical dependency on narcotic drugs.

On March 2, 1992, the Department held its second hearing to determine whether Petersen was permanently and totally disabled. The Department made its decision based on the complete file and record of the 1987 hearing and the additional evidence received at the 1992 hearing.[5]

At the second hearing Petersen testified that he suffered constant and severe pain and that frequent changes of position were necessary to relieve his pain. He testified that sitting and standing for long periods of time was very uncomfortable. He stated that he could no longer do 80 to 90% of the activities he was once able to do. Petersen testified that he tried to lead as normal a life

---

Dr. Opheim, a neurologist who evaluated Petersen in April of 1984 and June of 1985, also recommended a comprehensive back pain program prior to employment.
Dr. Geibink, an orthopedic surgeon who had examined Petersen in December of 1986, recommended a pain clinic as well.

4. Dr. Dickinson testified that the refusal was because of Petersen's fear of re-injury or "that he might get himself rehabilitated to the point where he would lose his disability rating and then find that he was still incapable of working." It was Dr. Dickinson's opinion that if motivated, Petersen could participate in a pain program and successfully complete it. Dr. Dickinson testified that Petersen was fearful about involving himself in such a program and that "he seemed very comfortable with his living situation."

5. On August 21, 1992, Petersen moved the Department to reconsider its decision to deny his claim. He attached to his motion an affidavit signed by Dr. Elkjer. In his affidavit Dr. Elkjer

stated that Petersen suffered from chronic pain syndrome; that there were psychogenic elements underlying his condition, but his pain was physical in origin; that maximum medical rehabilitation had been achieved and no fundamental change could be expected; and that Petersen was permanently and totally disabled and his condition would only deteriorate with time.

This affidavit was submitted to the Department after it had issued its Decision. It was submitted as part of a motion to reconsider. Petersen did not apply to the Circuit Court for leave to present additional evidence as required by SDCL 1–26–34. He made no showing that he had a good reason for his failure to present the affidavit at the hearing before the Department. While the Department may have considered the affidavit in denying the motion to reconsider, it does not appear that the affidavit was ever in evidence before either the Department or the Circuit Court. Thus it is not before us on appeal. *See, Berdahl v. Gillis,* 81 S.D. 436, 136 N.W.2d 633, 635 (1965).

as he could, but that his condition had deteriorated slowly since the 1985 surgery.[6]

Richard Ostrander testified at the second hearing as well. It was his opinion that if Petersen's functional limitations were the only consideration, Petersen could work and could probably complete a retraining program. However it was Ostrander's opinion that because of Petersen's pain limitations, his need to change positions frequently, and his lack of endurance, any type of competitive employment was ruled out and that even if Petersen was successfully retrained, he would have no reasonable expectation of employment thereafter. Ostrander further testified that based on tests he conducted, his opinion was that Petersen was neither malingering nor exaggerating his condition.

Three vocational rehabilitation specialists testified on behalf of the Employer and Insurer at the second hearing: Ms. Pat Gilman, Mr. Joel Lee [7] and Mr. Tom Karrow. Ms. Gilman opined that Petersen was employable in the Sioux Falls labor market, and testified that she had conducted a labor market survey and identified seven potential employment opportunities within Petersen's functional limitations. She followed up two of these with job site analysis and both employers indicated that they would be interested in interviewing Petersen.

Mr. Lee first became acquainted with Petersen in 1984 and had testified at the 1987 hearing. He became involved with Petersen again when Ms. Gilman left for employment elsewhere. Mr. Lee testified that he had contacted several of the employers listed in Petersen's job search log and opined that Petersen had intentionally sabotaged the interviews with these employers.[8] He further

testified that Petersen was directly employable in the Sioux Falls job market and that retraining would only add to his employability.

Mr. Karrow, a vocational consultant for Midwest Rehabilitation Consultants in Sioux Falls, was initially retained by Petersen's original attorney to testify on Petersen's behalf at the 1987 hearing. Mr. Karrow testified that he was in agreement with the opinions of Mr. Lee and Ms. Gilman, in that Petersen was employable in the Sioux Falls labor market, and that any retraining would benefit Petersen vocationally.

Based upon this testimony and all the other evidence submitted at the second hearing, the Department determined that Petersen failed to make a prima facie showing of permanent and total disability under the odd-lot doctrine and denied his claim.

## DECISION

### I. *STANDARD OF REVIEW*

This Court's scope of review from decisions of administrative agencies is controlled by SDCL 1–26–37 which provides:

An aggrieved party or the agency may obtain a review of any final judgment of the circuit court under this chapter by appeal to the Supreme Court. The appeal shall be taken as in other civil cases. The Supreme Court shall give the same deference to the findings of fact, conclusions of law and final judgment of the circuit court as it does to other appeals from the circuit court. **Such appeal may not be considered de novo.** (emphasis added).

---

6. Petersen testified that his normal daytime activities consisted of watching television, reading, taking a short walk and reclining on the sofa, which was his most comfortable position. Petersen also testified that he could only sit for thirty minutes or so and that it was more difficult to sit each progressive time. He stated that on days following long periods of sitting or exertion his discomfort was especially acute. He typically went to bed around ten or eleven p.m., arose sometime around seven or eight a.m., and would awaken three to four times a night for up to one-half hour. Finally, Petersen stated that he did not feel that he could work or complete a program of retraining due to his pain.

7. It should be noted that during the periods they were engaged in vocational searches, both Pat Gilman and Joel Lee were employed by Intracorp, a wholly owned subsidiary of Insurer.

8. Evidence was presented to the Department through Mr. Lee that of the list of fifty or so employers Petersen had supposedly applied to during his job search, some were not contacted, some were told by Petersen that he could not do the work and some were given false information by him.

Our standard of review for administrative decisions is found in SDCL 1–26–36, and is well established. We will overrule an agency's factual determinations only if we find them to be "clearly erroneous" in light of the entire evidence. However, conclusions of law are fully reviewable. *Permann v. Department of Labor, Unemployment Ins. Div.,* 411 N.W.2d 113 (S.D.1987). "Whether the claimant made a prima facie case that he belongs in the odd-lot total disability category is a question of fact." *Shepherd v. Moorman Mfg.,* 467 N.W.2d 916, 919 (S.D.1991). Thus, the "Department's determination that claimant failed to make the required prima facie showing will not be overturned unless we find that the determination was 'clearly erroneous.'" *Id.* "The test is whether after reviewing all the evidence we are left with a definite and firm conviction that a mistake has been made." *Day v. John Morrell & Co.,* 490 N.W.2d 720, 723 (S.D.1992). "Further, 'the question is not whether there is substantial evidence contrary to the agency finding, but whether there is substantial evidence to support the agency finding.... [T]he court shall give great weight to findings made and inferences drawn by an agency on questions of fact.'" *Matter of SDDS, Inc.,* 472 N.W.2d 502, 507 (S.D.1991) and *Kennedy v. Hubbard Milling Co.,* 465 N.W.2d 792, 794 (S.D.1991) (*quoting Lawler v. Windmill Restaurant,* 435 N.W.2d 708, 711 (S.D.1989) (Morgan, J., concurring specially)). Finally, in *Shepherd,* 467 N.W.2d at 919, we stated:

> This means that "[w]e do not substitute our judgment for that of [Department] on the weight of the evidence[.]" In other words, even if there is evidence in the record to contradict the Department's factual determination, so long as there is some "substantial evidence" in the record which supports the Department's determination, this court will affirm it. (citations omitted).

## II. THE "ODD–LOT" DOCTRINE

To qualify for "odd-lot" worker's compensation benefits, a claimant must show that he or she suffers a temporary or permanent "total disability." Our definition of "total disability" has been consistent since we first quoted *Schulte v. C.H. Peterson Constr. Co.,* 278 Minn. 79, 153 N.W.2d 130, 133–34 (1967) in *Barkdull v. Homestake Mining Co.,* 317 N.W.2d 417, 418 (S.D.1982):

> [A] person is totally disabled if his physical condition, in combination with his age, training, and experience, and the type of work available in his community, causes him to be unable to secure anything more than sporadic employment resulting in insubstantial income.

*Shepherd,* 467 N.W.2d at 918; *Tiensvold v. Universal Transport, Inc.,* 464 N.W.2d 820, 822 (S.D.1991); *Rank v. Lindblom,* 459 N.W.2d 247, 249 (S.D.1990); *Schlenker v. Boyd's Drug Mart,* 458 N.W.2d 368, 371 (S.D.1990); *Wendel v. Domestic Seed & Supply,* 446 N.W.2d 265, 270 (S.D.1989); and *Hanson v. Penrod Constr. Co.,* 425 N.W.2d 396, 398 (S.D.1988). Under this "odd-lot" test, the ultimate burden of persuasion remains with the claimant to make a prima facie showing that his physical impairment, mental capacity, education, training and age place him in the odd-lot category. The burden then shifts to the employer to show that some form of suitable work is regularly and continuously available to claimant. *Shepherd, supra; Kennedy,* 465 N.W.2d at 794; *Tiensvold, supra; Rank, supra; Schlenker, supra;* and *Wendel, supra.*

We have recognized two avenues by which a claimant may make the required prima facie showing for inclusion in the odd-lot category. First, if the claimant is **"obviously unemployable,"** then the burden of production shifts to the employer to show that some suitable employment is actually available in claimant's community for persons with claimant's limitations. *Shepherd,* 467 N.W.2d at 918 (*citing Rank,* 459 N.W.2d at 249; *Wendel,* 446 N.W.2d at 270 and 2 Larson, *The Law of Workmen's Compensation* § 57.61(c) (1989)); and *Tiensvold,* 464 N.W.2d at 823. A claimant may show "obvious unemployability" by: (1) showing that his "physical condition, coupled with his education, training and age **make it obvious** that he is in the odd-lot total disability category," or (2) persuading the trier of fact that he is in fact in the kind of continuous, severe and debilitating pain which he claims. *Shep-*

*herd, supra,* at 918–19. (emphasis added). Second, if " 'the claimant's medical impairment is so limited or specialized in nature **that he is not obviously unemployable** or relegated to the odd-lot category,' then the burden remains with the claimant to demonstrate the unavailability of suitable employment by showing that he has unsuccessfully made 'reasonable efforts' to find work." *Shepherd, supra,* at 918 (*citing* 2 Larson, *supra,* at § 57.61(d) and *Franklin Fabricators v. Irwin,* 306 A.2d 734, 737 (Del.1973) (emphasis added)). The burden will only shift to the employer in this second situation when the claimant produces substantial evidence that he is not employable in the competitive market. *Tiensvold, supra,* at 823. Thus, if the claimant is "obviously unemployable," he does not have to prove that he made reasonable efforts to find employment in the competitive market. *Id.*

### III. APPLICATION OF LAW TO THE INSTANT CASE

█ Petersen claims that the Department's decision denying him permanent total disability was clearly erroneous. He argues that because he has experienced continuous, severe and debilitating pain, he is "obviously unemployable," and a prima facie case for odd-lot benefits was established. Petersen relies on *Shepherd v. Moorman Mfg., supra,* to support his argument.

In *Shepherd* we recognized that when pain is the basis of a claim for inclusion in the odd-lot category, a claimant can make a prima facie case by proving either (1) that his physical condition, including the presence of pain, coupled with his education, training and age, makes him "obviously unemployable;" or (2) that he suffers continuous, severe and debilitating pain which is sufficient, by itself, to establish that he is "obviously unemployable." We will now review the evidence in light of each method of establishing a prima facie case.

### A. PAIN COUPLED WITH OTHER FACTORS:

As we stated in *Shepherd:*

> The crux of claimant's case for total disability is that he suffers such substantial and frequent pain that he not only cannot physically exert himself but he cannot even sit still or concentrate for more than a few minutes at a time, and that his endurance as well as his daily schedule can vary dramatically depending on whether he is having a good day or a bad day. Claimant argues that because of the overwhelming presence of pain in his life, coupled with his age and educational background, it ought to be manifest that no one is going to hire him for any kind of steady work, and the burden ought to be shifted to his former employer to show the existence of specific jobs in the [Sioux Falls] area suitable to someone with his limitations.

467 N.W.2d at 919.

The Department concluded that Petersen failed in his burden of proving that his physical condition, including pain, coupled with his education, training and age made it obvious that he was in the odd-lot category. We agree. The facts in this case deviate considerably from those upon which we relied in *Shepherd.*

#### 1. Age and Educational Background

The *Shepherd* claimant had a general agricultural work history and was 45 years old at the time of his accident, some 21 years older than Petersen at the time of his injury. Petersen was only 29 years old at the time of the Department's initial hearing in 1987, and is still only 35 years old with at least 30 years until general retirement age.

Further, while the *Shepherd* claimant had a high school equivalency degree, Petersen attended and graduated from Sioux Falls Lincoln High School where, as he testified at the 1992 hearing, he was involved in track, football, and cross-country as well as wrestling, where he placed second in state as a sophomore. Our intention here is not to belittle the accomplishments of the claimant in *Shepherd,* but simply to point out that Petersen's educational background can be characterized as more "well rounded." In addition, the evidence showed that Petersen is an intelligent individual who did well in his managerial capacity with Employer and

would be intellectually able to complete a college course.

### 2. Vocational & Educational Retraining

Approximately 6 to 8 months after suffering his injury, the *Shepherd* claimant independently applied for assistance with the South Dakota Department of Vocational Rehabilitation. This was in addition to the work being done by a private rehabilitation consultant hired by the insurer.

Petersen was advised by the Department in its June 1988 Decision, to "obtain extensive vocational counseling," and that "Claimant should engage in vocational counseling with a serious attempt on the part of the Claimant to determine a new vocation that is appropriate for him within his physical limitations." [9] Petersen then waited some two and a half years before retaining Mr. Richard Ostrander for vocational counseling. Petersen's actions do not evidence someone who is interested in getting rehabilitated vocationally when contrasted with those of the *Shepherd* claimant.

With regards to educational retraining, Petersen gave the following testimony on cross examination at the Department's second hearing in March of 1992:

MR. HARALDSON: Now, I asked you in your deposition whether you had any interest or intention of getting a job or being employed, and you said no. Is that your recollection?

PETERSEN: Yes.

MR. HARALDSON: And I asked you the same question with respect to any interest or intention of getting an education of any kind, and your answer was no. Is that your recollection?

PETERSEN: Yes.

MR. HARALDSON: I take it you have not pursued, since the deposition of May of '91, any further information or applications concerning education of yourself or any kind of training program as we sit here today?

PETERSEN: Well, I don't feel I have the ability to go—

MR. HARALDSON: Well, is the answer yes or no, you have or you haven't?

PETERSEN: I don't feel I have the ability to go to school eight hours a day and, no, I haven't.

MR. HARALDSON: So you have not pursued any education programs or information about them?

PETERSEN: No.

MR. HARALDSON: Now, Drs. Benson and Johnson released you to work or go back to school in 1987. Did you make any efforts between '87 and January of '91 to investigate or enroll or attend any educational or retraining programs during that time?

PETERSEN: No.

Petersen's testimony is clear that he made no attempt, and had no desire to reeducate himself so that he might become employed again, even though any retraining would have been at Employer's expense.

### 3. Employment Opportunities

In *Shepherd*, the claimant concededly made no efforts to find work. Petersen, on the other hand, did conduct a job search with potential employers prior to the Department's second hearing in 1992. This job search was conducted between October 28, 1991 and November 7, 1991. This brief job search notwithstanding, Petersen has not worked or otherwise attempted to find work since his injury in March of 1983. In addition, there was testimony at the Department's second hearing that Petersen may have "sabotaged" certain interviews during this job search. Even if this testimony is disregarded, Petersen's own testimony, along with the fact that he has spent less than two weeks actively seeking employment over a ten year period, seriously undermines his sincerity in becoming gainfully employed once again.

Finally, we note that even though the claimant in *Shepherd* did not attempt to find work, he did enter into negotiations to purchase a Black Hills tourist business in 1986. The purchase was never consummated because a fire destroyed the facility which was

9. All of which was to be at Employer's and    Insurer's expense.

the subject of the negotiations. Absent this unfortunate situation, the business would undoubtedly have "employed" the claimant and would have provided him with an independent income.

### 4. *Motivation*

Employer and Insurer argue that Petersen lacked motivation to become rehabilitated, reeducated or to be gainfully employed once again. In *Tiensvold,* 464 N.W.2d at 823–24, we held that "[a]lthough lack of motivation to work is only one factor to look at when considering if a claimant fits into the 'odd-lot' category, we believe it should be examined none the less." We went on to quote from the circuit court's opinion as follows:

> [T]he question of motivation deals primarily with a claimant's actions after the work-related injury. The issue is whether regular and sustaining work is available to claimant considering his physical condition, age, training and experience. His pre-injury work experience may give some insight into his character for industriousness, **but the focal point should be on how he responds to his disability.** With this focus in mind, the uncontradicted facts established [claimant] was unmotivated to work or seek rehabilitation after his injury even though his doctor recommended rehabilitation and work on a trial and error basis. [Claimant] abandoned even a pretense of interest in ever working again. (emphasis added).

*Id.* at 824.

Again, we refer to Petersen's own testimony where he affirmed his deposition testimony that he had no interest or intention of getting a job or being employed or of getting an education of any kind. His lack of expediency in obtaining vocational counseling after the Department's 1988 Decision also points to a lack of motivation. The most telling evidence on this point appeared in the office notes of Dr. Elkjer, Petersen's family physician, where he stated:

> He is upset by the fact that his insurance company and lawyer wants him to take another pain clinic. His feeling is that he just wants to [be] left alone on disability. I have tried to talk to him and rationalize

with him about the fact that he should be doing as .much as he can. He should be giving it every opportunity.

Although there was evidence Petersen was not malingering, there is also substantial evidence to support the Department's conclusion that Petersen lacked motivation to become retrained, reeducated or reemployed. Petersen has consistently testified that he did not "feel" that he could become retrained or reeducated because of his disability. However, in the decade since his injury, he has never attempted to work, enrolled in any university courses, or made an effort to retrain himself vocationally. He is unable to make a showing that he at least tried but, due to his pain, was unable to continue. Instead, he has dismissed all possibilities in advance, stating that he did not believe he could finish any of them.

### B. *CONTINUOUS, SEVERE AND DEBILITATING PAIN*

In the alternative, Petersen could make a prima facie case for odd-lot benefits based on our holding in *Shepherd,* by showing that he suffered continuous, severe and debilitating pain. As we stated therein:

> A worker's compensation claimant who persuades the trier of fact that he is in the kind of continuous, severe and debilitating pain which [claimant] claims has made a prima facie case that he is in the odd-lot category, and the burden then shifts to the employer to show availability of suitable work. Here, Department was not persuaded by claimant. Therefore, our "clearly erroneous" review of Department's determination resolves itself into this question: Is there any substantial evidence in the record that supports the Department's conclusion that claimant does not experience the kind of pain which he claims? If there is, we must uphold the Department's determination.

467 N.W.2d at 919–20.

■ Petersen argues that the pain he suffers is real, severe and debilitating, thereby causing him to be unemployable. The Department was not persuaded that Petersen suffered pain to the extent which he claimed.

We agree. The Department, as the fact finder, may properly weigh the evidence and determine the credibility of the witnesses. *Wendel*, 446 N.W.2d at 271. The "Department is not required to accept the testimony of the claimant and is free to choose between conflicting testimony." *Kennedy*, 465 N.W.2d at 796.

In his consultation notes dated April 4, 1984, Dr. O.V. Opheim wrote, "there is a lack of objective neurologic findings" to support the pain distribution complained of by Petersen. Dr. Johnson's office notes of November 21, 1984 state:

He moves very slowly and deliberately today and I noticed that he did run up and down the stairs very nicely at the Dakota Dome at the Championship game between Yankton and O'Gorman, he was sitting about 4 rows behind me.

Evidence was presented at the 1987 hearing that Petersen had intentionally tried to manipulate the results of the first FCA which was performed by Mr. Philip Moe. This test was considered invalid due to inconsistencies in Petersen's pain behaviors and pain reports.

In his deposition on September 18, 1991, Dr. Dickinson, Petersen's psychologist, testified that he agreed that Petersen's behavior was more demonstrative of pain than would be expected given his physical condition. Testimony was also given by Dr. Elkjer, Petersen's family physician, that there is a large functional overlay involved in his pain, and that he concurred with Dr. Opheim's opinion of a "lack of objective neurologic findings."

Several of Petersen's examining physicians released him for light-sedentary work with limitations on lifting including Dr. Gail Benson, the surgeon who performed the luque loop surgery. Dr. Benson released Petersen for work in 1987 and again on September 12, 1991. The 1991 release was for work activity within the limits of the June 11, 1991 FCA performed by Philip Moe.

Petersen argued that the FCA did not take into account the factor of pain and was thus not a valid measure of his ability to work. However at the 1992 hearing, Mr. Moe testified that pain is certainly a factor in the FCA. This is because the patient self-selects the point at which his pain causes him to be unable to continue an activity. Those activities a patient can engage in before pain causes him to be unable to continue are the basis for assessing a patient's functional capacities and ultimately his employability. As discussed above, there was testimony that Petersen was directly employable in the Sioux Falls job market within the restrictions found in the two FCAs conducted in 1991. From this the Department could properly conclude that Petersen did not suffer pain to the extent he claimed.

Finally we note that the Department's hearing officer had an opportunity to observe Petersen not only during his testimony at the March 1992 hearing, but throughout the entire hearing which lasted from 9:00 a.m. until 3:43 p.m. During that time, which parallels a normal working day, Petersen was continually present and subject to the normal constraints and demands inherent in sedentary or light-duty employment. The Department found that Petersen's claim that he was suffering continuous, severe and debilitating pain was not persuasive.

We have held that " 'it is incumbent upon this Court to be duly aware of the opportunity of the trial court to judge at first hand the credibility of the witnesses.' " *Matter of J.M.V.D.*, 285 N.W.2d 853, 855 (S.D.1979) (quoting *Cooper v. Hileman*, 88 S.D. 516, 518, 222 N.W.2d 299, 300 (1974)). We place these limitations on the appellate court since " 'the trial court because of its observation of the witnesses and their demeanor is in a better position than we are to evaluate the persuasiveness of their testimony.' " *Matter of J.M.V.D.*, *supra*, (quoting *State Automobile Casualty Under. v. Ruotsalainen*, 81 S.D. 472, 478, 136 N.W.2d 884, 888 (1965)). Similar deference should be given to the Department hearing officer acting as the fact finder. Accordingly, the Department's finding that it was not persuaded by Petersen's claim that he suffers continuous, severe and debilitating pain will not be disturbed.

We do not wish to appear unsympathetic to Mr. Petersen's condition. The evidence is undisputed that he suffers from a legitimate

disability. The dispute, however, is not whether Mr. Petersen has some disability. The dispute is whether Mr. Petersen presented sufficient evidence to make a prima facie showing that he is totally disabled.

We are mindful that our task is not to substitute our judgment for that of the Department as to issues of fact. Our standard of review limits us to decide whether the Department's determination that Mr. Petersen is not permanently and totally disabled is supported by substantial evidence.

Because Petersen's physical condition, including pain, coupled with his age, training and experience, does not make it obvious that he is in the odd-lot total disability category, and because substantial evidence exists in the record to support the Department's finding that Petersen's pain is not continuous, severe and debilitating, we conclude that the Department was not clearly erroneous in finding that Petersen failed to make a prima facie case for total disability under the odd-lot doctrine. Accordingly, the judgment is affirmed.

MILLER, C.J., and WUEST, HENDERSON and SABERS, JJ., concur.

LOVRIEN, Circuit Judge, for AMUNDSON, J., disqualified.