2000 SD 47

**Teresa JOHNSON, Appellant,**

v.

**ALBERTSON'S, Appellee.**

No. 21110.

Supreme Court of South Dakota.

Considered on Briefs Feb. 14, 2000.

Decided April 5, 2000.

Margo Tschetter Julius of Groves, Julius & Simpson, Rapid City, for appellant.

Dennis W. Finch of Finch Bettmann Maks, P.C., Rapid City, for appellee.

GILBERTSON, Justice

[¶ 1.] Teresa Johnson (Johnson) appeals the circuit court's order denying her claim for workers' compensation benefits. The Office of Hearing Examiners (hearing examiner) and the circuit court found Johnson had not proven her work-related injury was causally related to her mental disability. Johnson appeals. We affirm.

### FACTS AND PROCEDURE

[¶ 2.] Johnson began working at Albertson's supermarket in Rapid City, South Dakota in August of 1989. On January 31, 1990, she suffered an injury to her neck and upper back while stacking baking pans in the bakery department. Johnson was treated by a chiropractor for muscle strain and was then referred to Dr. Hollis Leroy Ahrlin, an orthopedic surgeon. Dr. Ahrlin described Johnson's condition as a back strain or myofascitis.[1] Dr. Ahrlin concluded Johnson's back strain would improve with time.

[¶ 3.] Johnson continued to work at Albertson's and on April 22, 1990, she aggra-

vated her muscle strain while lifting a garbage bag.[2] Dr. Ahrlin found Johnson's reflexes, sensation and motor function all to be within normal limits, but concluded she had aggravated her previous muscle strain. He advised Johnson to seek a different line of work, because if she continued to lift, she would again aggravate her muscle condition. Dr. Ahrlin did not expect Johnson to sustain any permanent impairment from this aggravation.

[¶ 4.] On November 13, 1990, Johnson saw Dr. Steven Goff, who recommended physical therapy. Dr. Goff never advised Johnson she could not or should not work.

[¶ 5.] On March 13, 1991, Dr. Steven Hata determined Johnson had a 4.5 percent permanent partial physical impairment due to her muscle strain. Johnson was given a second impairment rating by Dr. Goff on March 19, 1991, of 6 percent. Two percent of this rating was from his objective findings, while four percent was due to subjective complaints by Johnson.

[¶ 6.] Rick Ostrander, a certified rehabilitation specialist, first met with Johnson in April of 1991. Based on his meetings with Johnson and his review of the depositions of Dr. Finley, Dr. Goff and Dr. Ahrlin, as well as the medical and vocational testing records, Ostrander concluded that Johnson had a 92 percent reduction in employability, and that she was essentially unemployable in her community.

[¶ 7.] Albertson's retained Bill Penniston as its vocational expert and he found three job positions for Johnson with Albertson's. These jobs were customer service clerk, video clerk and bakery sales clerk. Penniston also performed a labor market survey of the Rapid City area and identified jobs regularly available to Johnson within her physical restrictions. These jobs included being a hostess, parking lot attendant, desk clerk, flagger, airport security and a

---

1. Myofascitis is defined as: "inflammation of a muscle and its fascia, particularly of the fascial insertion of muscle to bone." The Sloane–Dorland Annotated Medical–Legal Dictionary 472 (1987).

2. Johnson received temporary total disability payments through March 11, 1991 in the amount of $5,596.92.

tanning salon receptionist. Penniston determined there were jobs regularly and continuously available to Johnson in the Rapid City community and that she was employable.

[¶ 8.] On January 5, 1993, a Functional Capacities Assessment (FCA)[3] was performed on Johnson by Anthony Yurick, a physical therapist with Work Analysis Systems in Rapid City. The FCA indicated the results were an invalid representation of Johnson's true capabilities. An invalid assessment indicates the client has manipulated the assessment by portraying less capabilities than what the client is actually able to perform, and may be malingering.[4]

[¶ 9.] Dr. Finley's testimony was the only new medical evidence submitted at the second hearing,[5] held on December 2 and 3, 1997, before the hearing examiner. Dr. Finley testified in his September 23, 1997 deposition that Johnson was unem-ployable in the competitive labor market. He also testified her medical condition did not change substantially since his first deposition, but that her depression had increased. Dr. Finley also stated that Johnson was not malingering.

[¶ 10.] At the second hearing, Johnson claimed her January 31, 1990 work injury caused her to have pain which prevented her from working and that the pain and inability to work caused depression.

[¶ 11.] Shortly after Johnson received notification of the Department's first adverse decision on her workers' compensation claim, which was issued November 13, 1993, she was admitted to the Rapid City Regional Hospital psychiatric unit. Dr. Stephen Manlove, a psychiatrist, first saw Johnson in the psychiatric unit on November 18, 1993. Johnson later testified she was admitted because she was "devastat-

3. An FCA is a procedure where a therapist has a patient perform a series of activities to identify what that patient's capabilities are in performing the activities. Twenty-two standardized functional activities are assessed, including sitting, standing and walking, bending/stooping, squatting, crawling, climbing stairs, crouching, kneeling, balancing, moving weight, lifting, pushing, pulling and carrying. The therapist also examines activities that require repetitive use of the hands, feet and neck.

4. Malingering is the voluntary production and presentation of false or grossly exaggerated physical or psychological symptoms. The symptoms are produced in pursuit of certain goals, such as: to avoid military conscription or duty, to avoid work, to obtain financial compensation, to evade criminal prosecution, or to obtain drugs. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (DSM–III) § V65.20 *Malingering* (3d ed. 1980). This is consistent with Dr. Rewey's testimony concerning malingering. This Court has also defined malingering as "feigning or intentional exaggeration of a disability in order to draw compensation benefits." *Welch v. Automotive Co.*, 528 N.W.2d 406, 408 (S.D.1995).

5. Initially, this case was tried before the Department on March 30, 1993. A memorandum decision was issued on November 18, 1993, finding Johnson lacking in credibility and denying her claim for permanent total disability benefits.

Johnson then appealed to the Sixth Judicial Circuit Court, which found on September 15, 1994 that the Department had inappropriately applied the burden of proof requirement by assessing credibility at the prima facie stage of the proceedings. The court remanded the case back to the ALJ for further findings. The court stated:

The Department should clearly articulate whether it conclud[ed] that [Johnson] failed to meet her 'burden of persuasion' of substantial evidence to establish a prima facie showing. It should then consider conflicting evidence and credibility and articulate whether after a consideration *of all the evidence,* [Johnson] failed to meet her burden of persuasion.

Upon remand and after applying the standard of proof as directed by the circuit court, the Department found that Johnson did not meet her burden of persuasion in proving a compensable claim.

Johnson appealed to the circuit court, which again remanded the case to the Department to review its findings of fact concerning whether Albertson's had met its burden of proving suitable work was regularly and continuously available. However, the circuit court noted that "[i]n light of the Department's credibility judgments of [Johnson], this omission may appear to be a formality not worthy of remand."

ed" by the Department's denial of her workers' compensation claim and "[b]ecause they said that I was lying."

[¶ 12.] Dr. Manlove diagnosed Johnson as having dependent and borderline personality features, which "probably were the underpinnings for . her depression." Dr. Manlove also noted in Johnson's history that prior to her admission to the hospital, her stressors were the fact that she had lost her workers' compensation case about two weeks prior, she had to leave her husband, and had written several bad checks the day before. Dr. Manlove concluded that Johnson's January 19, 1990 injury contributed to her depression, that her depression was treatment resistant due to her pain and that her depression was a permanent medical condition making her unemployable.

[¶ 13.] On October 4, 1996, Johnson was again admitted to the psychiatric unit under the care of Dr. Vernard, who noted that she had a history of migraine headaches but denied having any other physical symptoms or medical problems at that time.

[¶ 14.] In September of 1997, Johnson underwent an MMPI–II test [6] at the Manlove Clinic. A normal range on the validity scale or "F" scale for MMPI test results is a score of between 50–65. Johnson's validity scale test results showed an elevated score of 82. Dr. Manlove, Johnson's treating psychiatrist, testified an elevation of the F scale "suggests exaggeration of symptoms, psychopathology, or true psychopathology." Dr. Scott Cherry, a clinical psychologist, testified at both trials on behalf of Johnson. Dr. Cherry believed Johnson's MMPI–II test results were elevated but concluded she was not malingering or exaggerating symptoms.

[¶ 15.] However, Dr. Robert Arnio, a clinical psychologist who testified on behalf of Albertson's, disagreed and stated that when the F value on the MMPI test reaches a certain range, the validity of the profile becomes questionable. He testified that scores in the range of 80–90 are suggestive of malingering and exaggerating problems versus scores in the normal range of 50–65.

[¶ 16.] Finally, Dr. Richard Rewey, a psychiatrist, evaluated Johnson's condition on behalf of Albertson's. After meeting with Johnson on July 30, 1997, and reviewing medical and vocational records and psychological test results, Dr. Rewey diagnosed Johnson with recurrent depression, marijuana dependence and malingering. Dr. Rewey also explained that Johnson demonstrated a pattern of malingering, according to the Diagnostic and Statistical Manual–IV (DSM–IV), a standard reference for psychologists and psychiatrists. The DSM–IV states: "[m]alingering should be strongly suspected if any combination of the following is noted:

1. Medicolegal context of presentation (e.g., the person is referred by an attorney to the clinician for examination);

2. Marked discrepancy between the person's claimed stress or disability and the objective findings;

3. Lack of cooperation during the diagnostic evaluation and in complying with the prescribed treatment regimen; and

4. The presence of Antisocial Personality Disorder.

[¶ 17.] Dr. Rewey also diagnosed Johnson with a mixed personality disorder with anti-social, borderline, paranoid and dependent features. Johnson was also diag-

---

6. MMPI stands for Minnesota Multi–Phasic Personality Inventory. The test is a standard objective psychological battery consisting of 550–566 true-false questions concerning behavior, feelings, social attitudes, and frank symptoms of psychopathology. To each question, the subject must answer true, false or cannot say. The subject's answer sheet is then scored by various keys that have been standardized on different diagnostic groups and personality types. Sloane–Dorland Annotated Medical–Legal Dictionary 717 (1987); Psychiatric Dictionary 640 (5th ed. 1981).

nosed with myofascial strain syndrome. Dr. Rewey concluded that Johnson's MMPI–II test results were consistent with her severe personality disorder. He testified that Johnson's personality disorder was the cause of her depression, and that her depression was exacerbated by ongoing substance abuse of both marijuana and alcohol. Johnson's medical records show a history of using illegal "street drugs," i.e., marijuana, cocaine and acid. Finally, Dr. Rewey concluded that Johnson's 1990 muscle strain was not a source of contribution to her depression, and that there was no reason she could not look for new employment.

[¶ 18.] At the second hearing, the hearing examiner found Johnson failed to meet her burden of persuasion because of lack of credibility. Johnson appealed this decision to the Sixth Judicial Circuit Court for a fourth time, which affirmed the decision of the hearing examiner and ruled Johnson had failed to meet her burden of persuasion of showing her 1990 injuries were causally related to her depression. Johnson appeals, raising the following issue for our consideration:

> Whether the hearing examiner's decision finding Johnson's depression was not causally related to her 1990 injuries at Albertson's was clearly erroneous.

## STANDARD OF REVIEW

[¶ 19.] Our standard of review pursuant to SDCL 1–26–36 requires us to give great weight to the Department or hearing examiner on factual questions. *Sopko v. C & R Transfer Co., Inc.,* 1998 SD 8, ¶ 6, 575 N.W.2d 225, 228 (citing *Helms v. Lynn's, Inc.,* 1996 SD 8, ¶¶ 9–10, 542 N.W.2d 764, 766; *Finck v. Northwest Sch. Dist. No. 52–3,* 417 N.W.2d 875, 878 (S.D.1988)). This Court reviews agency findings in the same manner as the circuit court in deciding whether they were clearly erroneous in light of all the evidence. *Id.* (citing *Matter of Northwestern Bell Tel. Co.,* 382 N.W.2d 413, 415 (S.D.1986)). Only if after a review of the entire record

we are definitely and firmly convinced a mistake has been committed will we reverse. *Id.* (citing *Spitzack v. Berg Corp.,* 532 N.W.2d 72, 75 (S.D.1995) (citing *Day v. John Morrell & Co.,* 490 N.W.2d 720, 723 (S.D.1992)). When the issue is a question of law, the actions of the agency are fully reviewable. *Kester v. Colonial Manor of Custer,* 1997 SD 127, ¶ 15, 571 N.W.2d 376, 379 (citing *Loewen v. Hyman Freightways, Inc.,* 1997 SD 2, ¶ 6, 557 N.W.2d 764, 766 (citing *Caldwell v. John Morrell & Co.,* 489 N.W.2d 353, 357 (S.D.1992); *Egemo v. Flores,* 470 N.W.2d 817, 820 (S.D.1991)). "We review the findings based on deposition testimony and documentary evidence under a de novo standard of review." *Id.* ¶ 15, 571 N.W.2d at 380 (citing *Hanten v. Palace Builders, Inc.,* 1997 SD 3, ¶ 8, 558 N.W.2d 76–78).

## ANALYSIS AND DECISION

[¶ 20.] **Whether the hearing examiner's decision finding Johnson's depression was not causally related to her 1990 injuries at Albertson's was clearly erroneous.**

[¶ 21.] In its bench decision, the circuit court ruled that Johnson failed to meet her burden of proving her depression and psychological problems were causally related to her 1990 work-related injuries. We agree.

[¶ 22.] Before Johnson can collect any benefits under our workers' compensation statutes, she must establish a causal connection between her injury and her employment. *Kester,* 1997 SD 127, ¶ 17, 571 N.W.2d at 380 (citing *Caldwell,* 489 N.W.2d at 357). Resolution of this issue is determinative of her claim and is clearly a question of fact, i.e., "one that is founded 'on the application of fact-finding tribunal's experience with the mainsprings of human conduct,'" "the answer to which is found in the testimony of the witnesses." *Lien v. Miracle Span Corp.,* 456 N.W.2d 563, 565 (S.D.1990) (internal citation omitted). We must give due regard to the opportunity of

the agency to judge the credibility of the witness. *Id.* In doing so, "[w]e do not substitute our judgment for the agency's judgment on the weight of the evidence pertaining to the questions of fact[.]" *Id.* The causation requirement requires Johnson to show her employment was a "contributing factor" to her mental injury. *Kester,* 1997 SD 127, ¶ 17, 571 N.W.2d at 380.[7] Here, it is not disputed that Johnson's back strain arose out of and in the course of her employment with Albertson's. However, it is Johnson's claim of depression resulting from these injuries that Albertson's is contesting. Johnson argues her 1990 work related injuries contributed to her depression and her inability to work.[8] She also contends her personal "credibility" is irrelevant to her workers' compensation claim as she relies upon her expert witnesses. Albertson's counters that Johnson failed to establish causation between her back strain and claim of depression. Albertson's also argues Johnson's claim of depression did not arise until after the Department denied her workers' compensation claim and that she failed to establish her credibility.

[¶ 23.] Johnson was injured with her neck and upper back strain in 1990. It was not until after the Department denied her workers' compensation claim in November of 1993 that Johnson claimed she was suffering from depression due to her physical injuries. Thus, it was not until the second hearing in this matter that Johnson made her claim of depression due to her chronic pain and inability to work. Such a gap in time raises doubt as to whether Johnson's depression is causally related to her 1990 injuries. "Where there is no obvious causal relationship the testimony of a medical expert may be necessary to establish the causal connection." *Id.* ¶ 19 (citing *Howe v. Farmers Coop. Creamery,* 81 S.D. 207, 212, 132 N.W.2d 844, 846 (1965)); *see also Buczynski v. Workmen's Compensation Appeal Bd.,* 133 Pa.Cmwlth. 532, 576 A.2d 421, 423 (1990) (citing *Hilton Hotel Corp. v. Workmen's Compensation Appeal Bd.,* 102 Pa.Cmwlth. 528, 518 A.2d 1316 (1986) (stating that "[i]t is manifest ... that psychological disorders such as ... depression are not the 'immediate and direct' or 'natural and probable' consequences of a [back] strain," and "unequivocal medical testimony" is necessary to demonstrate causation).

[¶ 24.] Although the psychological experts in this case, Dr. Cherry, Dr. Lord, Dr. Manlove, Dr. Arnio and Dr. Rewey[9] agree that Johnson is severely depressed,[10] they do not agree as to the cause of her depression. Dr. Rewey concluded that Johnson's depression is not causally related to her work injuries, but "is predominantly coming from the ongoing consequences of her personality disorder ... the ongoing substance abuse, use and abuse of both marijuana ... of alcohol ... [and] from time to time of some prescription drug abuse."[11] Both Drs. Arnio and Manlove agreed that Johnson's behavior

---

7. Prior to its amendment in 1995, SDCL 62–1–1 stated:
   [p]ursuant to SDCL 62–1–1(7), "[a] mental injury is compensable only if a compensable physical injury is and remains a major contributing cause of the mental injury, as shown by clear and convincing evidence. A mental injury is any psychological, psychiatric, or emotional condition for which compensation is sought."

8. Essentially Johnson is arguing she has suffered a "physical-mental" injury. We noted in *Everingim v. Good Samaritan Center,* 1996 SD 104, ¶ 25, 552 N.W.2d 837, 841, a physical-mental injury is defined as: "[w]hen there has been a physical accident or trauma, and claimant's disability is increased or prolonged by traumatic neurosis, conversion hysteria, or hysterical paralysis, it is now uniformly held that the full disability including the effects of the neurosis is compensable."

9. Dr. Finley did not give an opinion as to whether the depression was causally related to her muscle strain injury.

10. It appears Johnson takes several medications for her depression, including Prozac.

11. The record indicates Johnson would occasionally "bum" prescription medications from other people.

observed during treatment is consistent with a borderline personality disorder. In fact, in his discharge summary dated November 26, 1993, Dr. Manlove stated that Johnson's "dependent personality traits were a major factor in her depression." He also stated "[Johnson] also showed a tendency to split and manipulate and also a tendency toward rejection [sensitivity] which are consistent with borderline personality disorder."

[¶ 25.] We agree with the hearing examiner's finding that since Johnson was lacking in credibility and because "the opinions of [Johnson's] expert witnesses regarding her condition were based in large part on what she told them, the opinions of those experts lack an adequate foundation." A long-accepted premise is that the purpose of expert testimony is to assist the trier of fact and not to supplant it. *Bridge v. Karl's Inc.*, 538 N.W.2d 521, 525 (S.D.1995) (citing *Olesen v. Lee*, 524 N.W.2d 616, 620 (S.D.1994)). Experts do not determine credibility.

> This state is not a trial-by-expert jurisdiction. *Cf. State v. Jenkins*, 260 N.W.2d 509, 513 (S.D.1977). The value of the opinion of an expert witness is no better than the facts upon which it is based. It cannot rise above its foundation and proves nothing if its factual basis is not true. It may prove little if only partially true. *Podio v. American Colloid Co.*, 83 S.D. 528, 532, 162 N.W.2d 385, 387 (1968). The credibility of witnesses and the evidentiary value of their testimony falls solely within the province of the [fact finder].

*Id.*

[¶ 26.] "The trier of fact is free to accept all of, part of, or none of, an expert's opinion." *Kester*, 1997 SD 127, ¶ 24, 571 N.W.2d at 380 (citing *Hanson v. Penrod Constr. Co.*, 425 N.W.2d 396, 398 (S.D. 1988)). The reviewing agency "is not required to accept the testimony of the claimant and is free to choose between conflicting testimony." *Wagaman v. Sioux Falls Constr.*, 1998 SD 27, ¶ 29, 576

N.W.2d 237, 242–43 (citing *Petersen v. Hinky Dinky*, 515 N.W.2d 226, 235 (S.D. 1994)). There is substantial evidence to support the determinations of the hearing examiner and the Department that Johnson was not a credible witness and, thus, her subjective testimony as to pain could also be determined not to be credible. *Id.*

[¶ 27.] There is substantial evidence in the record to support the hearing examiner's determination that Johnson was malingering. Johnson's expert, Dr. Cherry, agreed with Dr. Rewey that the most "objective" evaluation of Johnson in this case is the MMPI testing. The results of the testing suggested Johnson may be malingering her physical symptoms. After a review of all the evidence in this case, it appears all four of the indicators of malingering are present. First, the medical legal context of Johnson's claim—Johnson's claim of depression and resulting treatment—only began after her claim was denied by the Department. Most notably, neither Dr. Lord nor Dr. Manlove were aware of any treatment for depression of Johnson until her workers' compensation claim was denied.

[¶ 28.] Second, there is a marked discrepancy between Johnson's claimed depression and the objective findings. Dr. Goff stated that the FCA is the only objective means available to evaluate Johnson's physical ability to work. Yurick testified that the FCA was an invalid assessment of Johnson's true capacities. He testified Johnson had manipulated the assessment by portraying less physical capabilities then what she was actually able to perform. Yurick also indicated Johnson overemphasized during certain activities, portraying distress by grasping her shoulder, struggle to move weights and hunch over at the waist while reporting difficulty. Yurick observed that Johnson's heart rate did not support the level of distress or exertion exhibited by her in the exercises.

Johnson's elevated score of 82 on the MMPI–II also suggests malingering.

The normal range for the MMPI–II is between 50–65. Dr. Cherry admitted the F scale on the MMPI test of Johnson was elevated. Dr. Arnio testified that scores in the range of 80–90 are suggestive of malingering and exaggerating symptoms. Dr. Arnio also reviewed Johnson's MMPI–II test results, and took her answers and re-entered them into a computer program provided by National Computer Systems and generated an "interpretative report." Dr. Arnio testified that the interpretative report is usually run if there is a question or if the profiles are highly elevated. The advantage of this report is that the interpretative statements offered in the report are based upon specific mathematical criteria developed by the makers of the test. Dr. Arnio also explained that since the interpretative report is computer generated it can be more objective and not subject to human factors of interpretation.

[¶ 29.] Third, Johnson showed lack of cooperation during her evaluations and in complying with prescribed treatment. During some of Johnson's psychiatric hospital admissions, she refused physicals, drug testing, denied any history of alcohol or drug abuse, denied any history of legal problems, and left the hospital against medical advice. Johnson has an extensive history of drug use, including marijuana, cocaine and acid. She testified before the hearing examiner that she uses marijuana "[p]robably twice, three times a week...." Johnson also denied ever having suicidal thoughts.[12] Moreover, when Johnson was admitted to the psychiatric unit on July 10, 1997, she denied having any physical symptoms and refused to be examined. There is also evidence in the record that Johnson may not have been entirely truthful to Carol Foster, a counselor who testified for Johnson at the second trial. On September 9, 1997, Johnson told Foster she had not gambled, smoked marijuana or drank any alcohol for two weeks. However, the discharge summary from Johnson's psychiatric visit to the hospital in October of 1997 included a toxicology report which indicated Johnson had tested positive for cannabis.

[¶ 30.] The fourth factor is the presence of Antisocial Personality Disorder. Dr. Rewey concluded Johnson suffers from a mixed personality disorder, "with features of antisocial, borderline, paranoid, and dependent features." Dr. Manlove agreed Johnson's behavior is consistent with borderline personality disorder.

[¶ 31.] After reviewing the extensive record in this case, it is clear Johnson's credibility is questionable. Before the first trial in this case, Johnson searched for some work after completing her pain management program. She performed some volunteer work for the City of Rapid City as a file clerk. Johnson's supervisor there testified that Johnson performed her duties without any problems, but that she was terminated when she did not show up for her assigned duties. The supervisor also testified Johnson had advised her one of the reasons she had to quit the volunteer job was she could not afford gas for her car. However, Johnson testified she did not return to the job because it aggravated her condition.

[¶ 32.] Johnson also admitted she could work. She testified before the hearing examiner that she could handle certain kinds of work. Johnson had worked as a restaurant hostess, and "didn't mind hostessing. It was more tedious just standing there. I'm more of an energetic motivated person. And to just stand around, it was quite boring, I might say." Johnson also testified she had worked for about six months for two towing services and had cleaned a friend's trailer. Yet Johnson

12. Johnson had previously been counseled for depression and suicidal thoughts. In 1987 Johnson was counseled for depression at West River Mental Health Center (Behavior Management). Again, in May of 1989 Johnson was admitted there after a threatened overdose.

then testified at the same hearing that she could not work at all.

[¶ 33.] In addition, Johnson contends her pain and inability to work caused her to be depressed and that was the reason for her admission to psychiatric care. However, Johnson testified that in November of 1993, she was admitted to the psychiatric unit at the Rapid City Regional Hospital because she was "devastated" by the Department's decision denying her workers' compensation claim and finding lack of credibility on her part. Also, after the initial adverse decision by the Department in October of 1993, Johnson wrote to Cox–Pierce Agency, an insurance adjustment agency for Albertson's. Johnson wrote:

> In light of the recent treatment I received from you and the state of South Dakota, I was recently hospitalized, I am presently under treatment for a severe case of depression. I do also intend to charge you with my mental condition. It does not take a rocket scientist to figure out that let down after let down from you and the state is what led to my depressive state.

[¶ 34.] Finally, the Rapid City Regional Hospital psychiatric unit utilizes a form entitled "What's the Problem?" The form asks the patient to list things in his or her life which led to the hospitalization. Johnson listed several things on the form as precipitating her admission: "Albertson's 11–93; Department of Labor – Judge Marcia Whiting; Wayne Laton from Action Auto; Don Alexander from Frontier Motors; Augie Martinez, boyfriend; mother-father-brothers." There is no mention of any physical pain or problems on this form. It is apparent from the evidence in this case that Johnson consistently refers to the date of November 1993 as the day she lost her workers' compensation claim

and the reasons for her mental problems. We agree with the circuit court's conclusion that there is evidence in the record that Johnson's physical pain was not a contributing factor to her depression. Rather, the record indicates Johnson's mental condition was instead caused from the legal process involved in her workers' compensation claim.

[¶ 35.] This case has been appealed to the Sixth Judicial Circuit Court four times. Each time the case was remanded back to the Department, the ALJ found Johnson lacking in credibility. The hearing examiner, as well as the circuit court agreed lack Johnson's credibility was a major issue in this case.[13] We agree.

[¶ 36.] After a review of the extensive record in this case, a case that has spanned over six years of litigation, we are not left with a definite and firm conviction a mistake has been made. It is the duty of the Department and the hearing examiner to choose between conflicting expert testimony and to judge Johnson's credibility. *Wagaman*, 1998 SD 27, ¶ 43, 576 N.W.2d at 244 (citing *Hanson*, 425 N.W.2d at 398). Given the hearing examiner's ability to judge the credibility of the witnesses, we cannot say it was clearly erroneous in denying Johnson workers' compensation benefits for her depression. The findings of both the Department and the hearing examiner that Johnson was lacking in credibility were not clearly erroneous, as we find substantial evidence to support their conclusions. The hearing examiner was free to disregard Johnson's testimony and her medical experts as their opinions were based upon her subjective complaints. Likewise, the hearing examiner was entitled to give greater weight to Dr. Rewey's testimony and opinions.

---

13. In addition to all of the above-mentioned evidence, there is evidence that Johnson has been convicted of a crime involving dishonesty. Johnson admitted that in October of 1993 she had been arrested for and found guilty of shoplifting. She was also charged with drug possession and possession of drug paraphernalia in 1993 as well. Finally, at the second trial before the hearing examiner, after testifying about the above conviction, Johnson denied that she had any other arrests or convictions. However, counsel reminded her on cross-examination that she had been arrested for obstruction of justice.

458

[¶ 37.] The decision of the hearing examiner is affirmed.

[¶ 38.] MILLER, Chief Justice, and SABERS, AMUNDSON, and KONENKAMP, Justices, concur.