2000 SD 130

**Delores M. GORDON, a/k/a Dot Gordon, Employee, Claimant and Appellant,**

v.

**ST. MARY'S HEALTHCARE CENTER and Heritage Mutual Insurance Company, Employer, Insurer and Appellees.**

**Nos. 21311, 21331.**

Supreme Court of South Dakota.

Considered on Briefs May 30, 2000.

Decided Sept. 20, 2000.

---

Mark A. Moreno and Brett M. Koenecke of Schmidt, Schroyer & Moreno, Pierre, South Dakota, Attorneys for employee, claimant and appellant.

J.G. Shultz of Woods, Fuller, Shultz & Smith Sioux Falls, South Dakota, Attorneys for employer, insurer and appellees.

SEVERSON, Circuit Judge

[¶ 1.] Delores M. Gordon (Gordon) appeals the Department of Labor's (DOL) denial of her petition for worker's compensation benefits for injuries she sustained in July 1994. DOL found that Gordon's testimony on the notice issue lacked credibility, and determined that she did not provide sufficient notice of her July 1994 injuries. On appeal, the circuit court affirmed the decision of DOL. We affirm.

## FACTS

[¶ 2.] Since 1979, Gordon has been employed as a licensed practical nurse at Maryhouse, a nursing home facility operated by St. Mary's Healthcare Center in Pierre. Gordon was frequently required to lift and move nursing home patients, equipment, and other heavy items. She experienced numerous work-related injuries during her tenure at Maryhouse, including a right shoulder strain in February 1985, a hip and neck injury in 1990, a neck, shoulder, and arm injury in 1991, a back injury in November 1991, an ankle sprain in 1992, and a back injury in 1993.

[¶ 3.] On July 2, 1994, Peggy Taft (Taft), a nurse's aid at Maryhouse, asked Gordon to assist her in moving a stroke resident off of a bathroom stool. As Taft and Gordon were lifting the patient, one of the patient's legs gave out, causing the patient to collapse against Gordon. Immediately after the incident, Gordon informed Taft that she injured her back, and laid down on the patient's bed. After resting on the bed, Gordon took some Tylenol, put ice on her back, and went back to work, completing her scheduled shift.

[¶ 4.] Other than telling co-worker Taft that she injured her back, Gordon did not report the incident either that day or the next, and did not seek medical treatment for her back in the following week. After the July 2 episode, and up until July 23, 1994, Gordon did not miss any of her scheduled workdays at Maryhouse.

[¶ 5.] Gordon took a trip to the Badlands on July 23 and 24. Following the trip, she was scheduled to be on vacation from July 25 through July 28. On July 25, Gordon began babysitting her eighteen-month-old grandson. During the daytime hours of July 25 and 26, she was the sole caregiver for the infant child. While she was at home on July 27, Gordon suffered an acute episode of back pain.

[¶ 6.] Gordon was immediately taken to see Dr. Curt Kuehl, her chiropractor. Kuehl could not help Gordon, and referred her to see Dr. S.Y. Stout, an orthopedist. Dr. Stout was not immediately available to see Gordon, so she was taken to see Dr. Kenneth Bartholomew, her family physician. Dr. Bartholomew administered pain medication to Gordon and sent her home.

[¶ 7.] The pain continued into the next day, and after midnight on July 29, 1994, Gordon was taken by ambulance and admitted to St. Mary's. Upon her admission to the hospital, Dr. Stout examined Gordon and diagnosed her with having a herniated disc at L4–5. Based on his diagnosis, Dr. Stout referred Gordon to see Dr. Michel Malek, a neurosurgeon from Aberdeen. On July 30, 1994, Gordon was transferred to St. Luke's Hospital in Aberdeen to have surgery performed on her back. Prior to her transfer to Aberdeen, Gordon's husband Jim (Jim), informed the staff at Maryhouse through several telephone calls that she required back surgery and that she would be unable to work.

[¶ 8.] The circumstances surrounding the July 27 episode are unclear. Although Gordon contends that she was walking empty handed across her living room when the back pain "hit," notes contemporaneously prepared by her treating physicians fail to support this claim. Dr. Kuehl's notes indicate that "she did nothing more than bend forward at home and she began to get acute severe pain." Gordon denies making this statement. Dr. Stout's notes indicate that "she got out of bed and apparently lifted the grandchildren." This statement apparently came from Jim. Finally, physical therapy notes taken on August 1, 1994, indicate that her symptoms began "following working in a stooped over position for a couple of hours." Gordon does not know where this information came from.

[¶ 9.] On August 2, 1994, Dr. Malek performed surgery on Gordon to correct her herniated disc and related back problems. Shortly after the surgery, Dr. Malek informed Gordon's family members that her employment duties at Maryhouse contributed to her back condition, and the result-

ing need for corrective surgery. Gordon's daughter relayed this information to Gordon on August 3, 1994, the day after the surgery. Gordon was discharged from St. Luke's and allowed to return home on August 4, 1994.

[¶ 10.] A few days later, on August 7, 1994, Gordon's son informed her of Dr. Malek's opinion regarding the work-related nature of the injury. According to Gordon, she was not aware her condition was work-related until she was told of Dr. Malek's opinions in August 1994. Gordon testified during the DOL hearing that she called Paul Marso (Marso), St. Mary's Vice President for Human Resources, on August 8, 1994, and informed him that she would like to file a worker's compensation claim. Marso disputed this version of events, and testified before DOL that he received the phone call from Gordon not on August 8, but between August 25 and September 1.

[¶ 11.] Gordon testified that following her discussion with Marso, she submitted a completed incident report form before September 1, 1994 that detailed the work-related nature of her injuries and her desire to seek worker's compensation benefits. However, the incident report form Gordon claims to have submitted has never been found. Gordon further testified that on September 1, 1994, she received a phone call from Carol Laumbach, a secretary at Maryhouse, informing her that the incident report form she allegedly submitted prior to September 1 was defective because it pertained to her 1991 back injury. Gordon claims that Laumbach informed her that she would have to make out a new incident report form. While acknowledging that these events "may have happened," Laumbach testified that she cannot confirm or deny speaking with Gordon about the first incident report form Gordon claims to have filled out.

[¶ 12.] From the date of the incident on July 27, 1994, through September 25, 1994, Gordon did not work at Maryhouse. On September 26, 1994, Gordon returned to work at Maryhouse on a part-time basis. Eventually, on November 11, 1994, she returned to full-time status. While Gordon was working at Maryhouse on December 1, 1994, she slipped and fell in some water, injuring her back, head, neck, hip and legs. Gordon reported this incident that same day to Linda Thorson, the Nursing Director at Maryhouse.

[¶ 13.] Heritage Mutual Insurance Company (Heritage) provided worker's compensation coverage for St. Mary's between August 1, 1993 through August 1, 1994. Thereafter, Reliance National Company (Reliance) provided St. Mary's with coverage, and was on the risk for providing benefits when Gordon's December 1, 1994 incident occurred. In August 1995, Gordon commenced this action by filing a petition for hearing with DOL alleging entitlement to worker's compensation benefits from Heritage for her July 1994 injuries, and Reliance for her December 1994 injury.

[¶ 14.] After conducting a hearing, DOL issued a decision denying both claims for worker's compensation benefits. DOL ruled that Gordon was not entitled to benefits for the injuries she sustained in July 1994 because she failed to sustain her burden of proving any of the following: that she provided timely notice of the alleged injuries, that St. Mary's had timely actual or constructive knowledge of the alleged injuries, that the alleged injuries were work-related, or that she had good cause for failing to provide timely notice of the alleged injuries. DOL's ruling on the two incidents in July 1994 turned on the hearing examiner's factual finding that Gordon's testimony on the issue of notice lacked credibility. DOL also denied Gordon benefits for the December 1, 1994 incident, ruling that the incident was not a contributing factor to Gordon's back injury.

[¶ 15.] Gordon appealed DOL's decision regarding the July 1994 incidents to the circuit court, but elected not to appeal

DOL's ruling on the December 1, 1994 incident. On appeal, the circuit court affirmed DOL's decision. Gordon appeals to this Court, presenting the following two issues for our review:

Whether DOL committed prejudicial error by imposing an increased burden of proof on Gordon with respect to St. Mary's knowledge of her July 1994 injuries.

Whether St. Mary's, by and through one or more of its representatives, had notice/knowledge of·Gordon's July 1994 injuries for purposes of SDCL 62–7–10.

## STANDARD OF REVIEW

■ [¶ 16.] Our standard of review in worker's compensation cases is well settled. In worker's compensation cases, this Court gives great weight to the findings and inferences made by DOL on factual questions. *Wagaman v. Sioux Falls Const.*, 1998 SD 27, ¶ 12, 576 N.W.2d 237, 240 (citing *Sopko v. C & R Transfer Co., Inc.*, 1998 SD 8, ¶ 6, 575 N.W.2d 225). "Under SDCL 1–26–37, when the issue is a question of fact then the clearly erroneous standard is applied to the agency's findings; however, when the issue is a question of law, the actions of the agency are fully reviewable." *Id.* (citing *Loewen v. Hyman Freightways, Inc.*, 1997 SD 2, ¶ 6, 557 N.W.2d 764, 766). When reviewing agency findings, we "will reverse, only if, after careful review of the entire record, we are definitely and firmly convinced a mistake has been made." *Id.* (citation omitted).

## ANALYSIS AND DECISION

[¶ 17.] **Whether DOL committed prejudicial error by imposing an increased burden of proof on Gordon with respect**

to St. Mary's knowledge of her July 1994 injuries.

■ [¶ 18.] Quoting from a portion of our decision in *Streyle v. Steiner Corp.*, 345 N.W.2d 865, 866 (S.D.1984), DOL opined in its written decision that where a claimant has a pre-existing weakness, "the burden increases on the claimant to show that the employer's knowledge of the particular manifestation of injury should be taken as knowledge that it is work-connected." Gordon, who experienced numerous work-related injuries during her tenure at Maryhouse, argues that it was error for DOL to rely on *Streyle* and impose a heightened burden for demonstrating that St. Mary's knew that the injuries she suffered in July 1994· were work-related. Since Gordon's argument speaks to the proper application of the notice requirement in worker's compensation cases, our focus shifts to our precedent in this area.

[¶ 19.] In worker's compensation cases, the notice requirement is governed by SDCL 62–7–10. We have instructed that "[t]he law in effect when the injury occurred governs the rights of the parties." *Loewen*, 1997 SD 2, ¶ 9, 557 N.W.2d at 766 (citation omitted). At the time Gordon's injuries occurred,[1] SDCL 62–7–10 provided as follows:

An employee who claims compensation for an injury shall immediately, or as soon thereafter as practical, notify the employer of the occurrence of the injury. Written notice of the injury shall be provided to the employer no later than three business days after its occurrence. The notice need not be in any particular form but must advise the employer of when, where, and how the injury occurred. Failure to give notice as required by this section prohibits a claim for compensation under this title unless

---

1. SDCL 62–7–10 was amended a few months prior to the injuries Gordon sustained in July of 1994, changing the time period for providing notice of an injury from 30 days to 3 business days after the occurrence of the incident. The new law took effect the day before

Gordon's July 2 incident with the patient. Thus, Gordon's injuries came under the umbrella of the amended notice statute, which requires written notice of the injury within "three business days after its occurrence."

the employee or the employee's representative can show:

> (1) The employer or the employer's representative had actual knowledge of the injury; or
>
> (2) The employer was given written notice after the date of the injury and the employee had good cause for failing to give written notice within the three business-day period, which determination shall be liberally construed in favor of the employee.

■ [¶ 20.] In South Dakota, a person seeking worker's compensation benefits has the burden of proving that she provided timely notice of the injury or that her employer had actual knowledge of the injury. *Miller v. Lake Area Hosp.*, 1996 SD 89, ¶ 11, 551 N.W.2d 817, 819 (citing SDCL 62–7–10; *Schuck v. John Morrell & Co.*, 529 N.W.2d 894, 897 (S.D.1995); *King v. Johnson Bros. Constr. Co.*, 83 S.D. 69, 73, 155 N.W.2d 183, 185 (1967); *Schindler v. Manchester Biscuit Co.*, 71 S.D. 336, 338, 24 N.W.2d 76, 77 (1946)). In addition, "not only must Claimant prove [that her employer] had notice of injury, but also must prove that [her employer] was on notice of the work-related nature of the injury." *Id.* (citation omitted).

[¶ 21.] We recently articulated the following regarding the notice an employee must provide an employer in order to gain worker's compensation benefits:

> The purpose of the notice requirement is to provide the employer an opportunity to investigate the cause and nature of an employee's injury while the facts are readily accessible. *Schuck*, 529 N.W.2d at 897 (citation omitted). Therefore, '[n]otice to the employer of an injury is a condition precedent to compensation.' *Loewen*, 1997 SD 2, ¶ 8, 557 N.W.2d at 766 (citations omitted). However, the failure to provide written notification to the employer may be excused if the employer had actual knowledge of the injury. SDCL 62–7–10. Additionally, if written notification is delayed, strict compliance with the statute is excused if

the employee has good cause justifying the delay.

*Vaughn v. John Morrell & Co.*, 2000 SD 31, ¶ 16, 606 N.W.2d 919, 923.

[¶ 22.] In *Streyle*, the case cited by DOL in its decision denying Gordon benefits, the claimant suffered from "a history of back problems" that were unrelated to her employment. 345 N.W.2d at 866. After an incident at work in which the claimant injured her back, the employer refused to provide worker's compensation benefits, arguing that the claimant failed to abide by the notice requirement codified at SDCL 62–7–10. The circuit court affirmed DOL's decision to dismiss the claimant's petition for failure to provide the employer with written or actual notice of the work-related injury. On appeal, we reversed, holding that the employer "had notice sufficient to meet the requirements of SDCL 62–7–10." *Id.* at 867.

[¶ 23.] In *Streyle*, we stated that "[w]here, as in this case, the claimant has a preexisting *nonoccupational* weakness, the burden increases on the claimant 'to show that the employer's knowledge of the particular manifestation of injury should be taken as knowledge that it was work-connected.'" *Id.* at 866–67 (quoting 3 Larson, *The Law of Workmen's Compensation,* § 78.31(a) (1982) (emphasis added)). Gordon argues that the burden we discussed in *Streyle* for claimants with a "preexisting nonoccupational weakness" was erroneously applied to her by DOL because, unlike the claimant in *Streyle*, Gordon's prior injuries are all occupational in nature, as they stem from her employment at Maryhouse.

■ [¶ 24.] In order to establish a worker's compensation claim, the "claimant has the burden of proving all facts essential to compensation." *Foltz v. Warner Transportation*, 516 N.W.2d 338, 341 (S.D.1994) (citation omitted). The term "burden of proof" encompasses two distinct, though related concepts. As the Supreme Court has explained:

For many years the term 'burden of proof' was ambiguous because the term was used to describe two distinct concepts. Burden of proof was frequently used to refer to what we now call the burden of persuasion—the notion that if the evidence is evenly balanced, the party that bears the burden of persuasion must lose. But it was also used to refer to what we now call the burden of production—a party's obligation to come forward with evidence to support its claim.

*Director, Office of Workers' Compensation Programs v. Greenwich Collieries,* 512 U.S. 267, 272, 114 S.Ct. 2251, 2255, 129 L.Ed.2d 221, 228 (1994). " 'It is generally said that the burden of production may pass from party to party as the case progresses while the burden of persuasion rests throughout on the party asserting the affirmative of an issue.' " *Hayes v. Luckey,* 33 F.Supp.2d 987, 990 (N.D.Ala. 1997) (citation omitted). Furthermore, our cases recognize "the generally accepted rule that the moving party has the burden of going forward *as well as the burden of persuasion* in administrative hearings." *Gourley v. Board of Trustees of South Dakota Retirement System,* 289 N.W.2d 251, 253 (S.D.1980) (citing *Wonder Life Co. v. Liddy,* 207 N.W.2d 27 (Iowa 1973) (emphasis added)).

■ [¶ 25.] In worker's compensation cases, "[t]he employee's burden of persuasion is by a preponderance of the evidence." *Foltz,* 516 N.W.2d at 341 (quoting *Caldwell v. John Morrell & Co.,* 489 N.W.2d 353, 358 (S.D.1992)). In determining whether a claimant has satisfied this burden, we have instructed that "[b]efore any award may be sustained, the findings of fact of the commissioner must be supported 'by substantial, credible, and reasonable evidence.' " *Id.* at 342 (quoting *Kraft v. Kolberg Mfg. Co.,* 88 S.D. 140, 215 N.W.2d 844, 846 (1974)).

■ [¶ 26.] Contrary to Gordon's argument, *Streyle* does not alter a claimant's "burden of proof." In *Streyle,* this Court quoted from a portion of a sentence found in Larson's treatise on worker's compensation. The full quote from Larson's treatise provides, "[a]s a matter of common sense, the fact that the claimant is known to have a preexisting nonoccupational weakness increases the burden on the claimant to show that the employer's knowledge of the particular manifestation of injury should be taken as knowledge that it was work-connected." *Larson, supra.* The language in *Streyle,* when read in conjunction with the full text from Larson's treatise, clearly refers to the persuasive weight of the evidence submitted, not an altered legal standard. Thus, a claimant suffering from a preexisting nonoccupational weakness *and* a claimant suffering from a preexisting occupational weakness are both required to demonstrate adequate notice of their injuries by a preponderance of the evidence. However, as a matter of common sense, when an employee suffers from a preexisting nonoccupational weakness the hearing examiner must take into account the employer's knowledge of the particular weakness when determining whether the employee has satisfied the burden of persuasion. Obviously, the employee suffering from a preexisting nonoccupational weakness will have more difficulty establishing that the employer's knowledge of the particular manifestation of the injury also constitutes knowledge that the injury is work-related. The actual quantum of proof necessary for the employee to sustain a claim for benefits does not change, and remains at a preponderance.

[¶ 27.] We conclude that this is the context in which DOL applied the language of *Streyle* to Gordon's claim for benefits. We also conclude that Gordon was not subjected to a heightened burden of persuasion by DOL. Gordon was merely required to prove the giving of adequate notice to St. Mary's by a preponderance of the evidence. Based on these conclusions, we rule that DOL did not commit reversible error, as it utilized the appropriate stan-

dard in determining whether Gordon supplied St. Mary's with sufficient notice of her injuries. Affirmed.

[¶ 28.] **Whether St. Mary's, by and through one or more of its representatives, had notice/knowledge of Gordon's July 1994 injuries for the purposes of SDCL 62-7-10.**

[¶ 29.] DOL ruled that Gordon did not provide timely notice of either her July 2 or her July 27, 1994 injuries. Since the circumstances surrounding these injuries are separate and distinct, we will review each injury independently.

### July 2, 1994 injury

[¶ 30.] It is undisputed that Gordon did not provide St. Mary's with written notice of her July 2, 1994 injury within three business days after the incident occurred. Therefore, in accordance with SDCL 62-7-10, Gordon must demonstrate that St. Mary's had actual knowledge of the injury, or that good cause prevented her from complying with the three-day period.

[¶ 31.] Gordon argues that St. Mary's obtained actual knowledge of the July 2 injury as the result of a conversation that occurred between Taft and Gordon's direct supervisor, Norma Newberger (Newberger). Newberger testified at the hearing with DOL that, after talking with Taft, she became aware that Gordon suffered a back injury lifting a patient within "a couple of days" after the incident. In addition, Gordon testified before DOL that within a week following the July 2 injury, she told Newberger "that I did do something to my back lifting [the patient]." Despite this testimony, the hearing examiner determined as a finding of fact that "Taft told Newberger about the July 2 incident on or about July 28, 1994." On appeal, the circuit court also stated in its decision that

Taft told Newberger about the July 2 incident on July 28, 1994.

[¶ 32.] "The standard used for determining whether an employer has actual knowledge is: whether the employer is 'alerted to the possibility of a claim so that a prompt investigation can be performed.'" *Vaughn,* 2000 SD 31, ¶ 28, 606 N.W.2d at 924 (quoting *Loewen,* 1997 SD 2, ¶ 18, 557 N.W.2d at 768). Gordon argues that DOL and the circuit court erred in finding that Taft informed Newberger of the incident on July 28, 1994. We agree. A review of the record demonstrates that no evidence supports DOL's finding that Taft informed Newberger of the incident on July 28, 1994. In contrast to DOL's finding, Taft could not have informed Newberger about the incident on July 28 because, as Taft testified during the hearing, she was out of town from July 26 through August 2 attending the funeral of her father. Therefore, we find that DOL's finding was clearly erroneous and incorrectly determined that Taft informed Newberger of the incident on July 28, 1994.

[¶ 33.] This determination, however, does not require us to reverse DOL's decision on the notice issue. Under our well-settled standard of review, we will reverse only if, after a careful review of the *entire* record, we are definitely and firmly convinced that a mistake has been made. *Wagaman,* 1998 SD 27, ¶ 12, 576 N.W.2d at 240 (citing *Sopko,* 1998 SD 8, ¶ 6, 575 N.W.2d at 228). When asked on cross-examination about when she learned of the patient incident, Newberger contradicted her earlier testimony, and indicated that she first became aware of the incident when Gordon was scheduled to have surgery performed on her back, which was nearly one month after the incident occurred.[2] When questioned further, New-

---

2. During the hearing with DOL, Newberger testified during cross examination as follows:

    Q. When did you first know then that Dot had suffered this injury with [the patient]; you said within a couple days of it, wasn't that your testimony?

    A. I believe I answered that when she said this, knowing that she was going to have back surgery, how soon did I know that it might have been related to [the patient]? I said it was within a couple of days.

berger testified that whether she learned of the incident only after the prospect of surgery for Gordon arose was either "fifty percent right" or "fifty percent wrong." Given the uncertainty that plagued Newberger's testimony, DOL was not clearly erroneous in declining to find that Taft informed Newberger of the patient incident within "a couple of days" after it occurred.

[¶ 34.] DOL also determined that Gordon's testimony on this issue lacked credibility and contradicted her other sworn statements. First, Gordon testified before DOL that she did not become aware of the work related nature of her injury until she was informed of Dr. Malek's opinion in August 1994. In contrast, however, Gordon also testified that she talked with Newberger about the July 2 incident within a week of its occurrence, indicating that she knew the injury was serious enough to report. Second, during a deposition taken before the hearing with DOL, Gordon denied ever having a conversation with Newberger about the July 2 incident after its occurrence.[3] This contradicts Gordon's testimony before DOL, in which she clearly recalled speaking with Newberger with-

> Q. Perhaps I misunderstood. When did you first know that she had the ... injury?
> A. I can't give you an exact date on that.
> Q. You don't know?
> A. I guess I don't completely understand your question because I don't know, and I didn't mean to make you laugh with it, Jeff. I need to have you explain it to me further.
> Q. I'll be happy to do that. Please let me try. My question is when did you first know – when did you first know that Dot Gordon was injured in a lift with Peggy Taft on July 2, 1994 with [the patient]?
> A. Okay, *I was aware of it just by talking to Peggy when I knew that Dot was going to Aberdeen to the hospital,* and I also talked to Peggy about it again when she came back to work after being on annual leave, which I believe was about the 2nd or 3rd of August. Like I was saying, Peg and I talked about it, whether it was related to this ... injury, if it had anything to do with it.

in one week after the incident. Third, Gordon reported seven work-related injuries prior to the July 2 incident, including one to her back that did not require medical treatment. Thus, she clearly understood the procedure for reporting injuries. The combination of these factors, along with the previously mentioned discrepancies in Gordon's history of events, caused DOL to conclude that her testimony lacked credibility.

[¶ 35.] In *Loewen*, we stressed that this Court has "long held that the [DOL] is in the best position to assess the credibility of the witnesses and the weight to be accorded their testimony, and we give due regard to its opportunity to observe the witnesses and the evidence first hand." 1997 SD 2, ¶ 11, 557 N.W.2d at 767 (citing *Petersen v. Hinky Dinky*, 515 N.W.2d 226, 235 (S.D. 1994); *Wendel v. Domestic Seed & Supply*, 446 N.W.2d 265, 271 (S.D.1989)). "We will not substitute our judgment for the agency's on an issue of credibility unless we are 'left with a definite and firm conviction that a mistake has been made.'" *Id.* (citation omitted).

[¶ 36.] In this case, Newberger's testimony failed to establish that St. Mary's

3. Gordon quarrels with DOL's finding that she "denied" ever speaking with Newberger about the July 2 incident during her deposition. Instead, Gordon argues that during her deposition, she merely could not recall telling Newberger that she experienced a work-related back injury in July 1994. Gordon attempted to reconcile her deposition testimony with her hearing testimony by claiming that Newberger first approached her about the incident, and inquired about the status of her back. According to Gordon, "I did not tell her. She came and asked me how my back was." As a result, Gordon claims she was being truthful when she could not recall ever telling Newberger about her injury. This explanation is untenable, and demonstrates the shifting nature of Gordon's testimony. Obviously, even if Newberger first approached Gordon about the incident, Gordon would still be required to *tell* Newberger about her injury. Therefore, Gordon's deposition testimony was clearly at odds with the testimony she provided at the hearing with DOL.

had actual notice of Gordon's July 2, 1994 incident. Furthermore, Gordon provided multiple versions of crucial events surrounding the July 2, 1994 incident. Under our standard of review, we will not second-guess DOL's credibility determinations unless we are definitely and firmly convinced that a mistake was made. We are not so convinced, and DOL's finding that Gordon failed to provide actual notice of her July 2, 1994 injury is affirmed.

### July 27, 1994 injury

[¶ 37.] In accordance with SDCL 62–7–10, Gordon claims that St. Mary's was provided with written notice of the July 27, 1994 incident within three business days of its occurrence, and that St. Mary's had actual knowledge of her injuries. DOL disagreed, and, like its ruling on the July 2 incident, determined that Gordon failed to provide adequate notice because her testimony about the July 27 incident lacked credibility. We find that the factual findings underlying DOL's ruling were not clearly erroneous.

[¶ 38.] Once again, DOL found that the testimony Gordon provided during the hearing contradicted her previous deposition testimony. During her deposition, Gordon testified that she did not inform anyone in Paul Marso's office about her intent to seek worker's compensation benefits until September 1994. During the hearing with DOL, however, Gordon contradicted her prior statement, and testified that she spoke with Marso on the telephone about her situation on August 8, 1994. Furthermore, during the hearing with DOL Gordon claimed to have submitted a first report of injury form prior to September 1, 1994. During her deposition, however, Gordon neglected to mention this critical fact, and as the circuit court noted "nor did the pre-September 1, 1994, first report of injury turn up when Marso specifically looked for it." Finally, in support of its credibility finding, DOL also noted the "multiple versions" of what occurred on July 27 that were documented in the medical records of Gordon's various treating physicians.

[¶ 39.] Gordon argues that DOL should not have based its credibility determination on the use of her deposition testimony. During the hearing, a transcript of Gordon's deposition testimony was not admitted into evidence. Instead, counsel for St. Mary's read passages of Gordon's deposition testimony into the record, and asked Gordon to explain why her deposition testimony differed from the testimony she provided during the hearing. According to Gordon, this was error, because DOL was never able to examine the entire transcript and look at the context within which Gordon provided her answers. We disagree.

[¶ 40.] Using prior deposition testimony in this manner to impeach a witness is permissible, and the prior sworn testimony need not be offered into evidence. Counsel for St. Mary's read portions of Gordon's testimony into the record, and provided Gordon with a copy of the deposition transcript that she was free to review. Gordon was afforded a complete opportunity to explain why her deposition testimony differed from the testimony she provided before DOL. A review of the hearing testimony demonstrates that Gordon had difficulty explaining why her deposition testimony differed from the testimony she provided before DOL. We see no error in Gordon's deposition transcript not being entered into the record.

[¶ 41.] Gordon argues that this case should not hinge on her perceived lack of credibility, because other independent evidence establishes that St. Mary's received written and actual notice of her July 27 injury. First, Gordon argues that written notice was provided to St. Mary's through the use of absence reports. Absence reports are documents prepared by the Maryhouse staff which record the date and reasons why an employee misses work. In the first three days following the July 27 incident, the phone calls Jim made

to Maryhouse were documented in separate absence reports by the nursing home's staff.[4] Second, Gordon claims that St. Mary's obtained actual knowledge of her July 27 injury shortly after the incident through various means. In summary, Gordon argues that St. Mary's obtained actual knowledge of the injury through the phone calls made to Maryhouse following her hospitalization, her history of back problems, the absence reports which documented the days she missed from work, and the testimony provided by various supervisory employees on their respective knowledge of her injury. We disagree with Gordon's conclusions.

[¶ 42.] When taken as a whole, the "independent evidence" articulated by Gordon only proves that St. Mary's knew of her absence from work, and that her absence was caused by a back injury that occurred while she was off work. An employer's mere knowledge of an injury does not satisfy the notice requirement because, under our standard of review, a claimant must also demonstrate that the employer knew about the compensable nature of the injury. *Miller*, 1996 SD 89, ¶ 11, 551 N.W.2d at 819 (citation omitted). DOL determined that Gordon did not sustain her burden on this issue, and that her testimony was lacking in credibility.

There is more than sufficient evidence in the record to support this determination, and Gordon has the burden of proof, both in the sense of burden of persuasion and burden of production, on giving timely notice of her injuries, or an exception—either actual knowledge by the employer or other good cause. She failed to prove that she provided written notice within three days of the injury and further failed to prove that she met either of the two statutory exceptions. We are not left with a definite and firm conviction that a mistake was made, and the decision of the circuit court is affirmed.

[¶ 43.] Because our decision is to affirm, we do not reach the employer's and insurer's notice of review issues.

[¶ 44.] AMUNDSON, KONENKAMP and GILBERTSON, Justices, concur.

[¶ 45.] SEVERSON, Circuit Judge, for MILLER, Chief Justice, disqualified.

[¶ 46.] SABERS, Justice, disqualified.

---

4. The absence reports documenting Gordon's injuries were not produced during the hearing with DOL. While the absence reports were not available for review at the hearing, St. Mary's does not dispute their use and existence.