#23948-rev & rem-JKK

**2007 SD 25**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

GINGER VOLLMER,                                             Appellant,

    v.

WAL-MART STORE, INC. and
NATIONAL UNION FIRE INSURANCE
OF PITTSBURGH, PA,                                          Appellees.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SIXTH JUDICIAL CIRCUIT
HUGHES COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE JAMES W. ANDERSON
Judge

\* \* \* \*

MICHAEL J. SIMPSON of
Julius & Simpson, LLP
Rapid City, South Dakota                    Attorneys for appellant.

COMET H. HARALDSON of
Woods, Fuller, Shultz and Smith
Sioux Falls, South Dakota                   Attorneys for appellee.

\* \* \* \*

CONSIDERED ON BRIEFS
ON MAY 23, 2006

OPINION FILED **03/07/07**

#23948

KONENKAMP, Justice

[¶1.] Ginger Vollmer appeals the circuit court's decision affirming the ruling by the Department of Labor dismissing her workers' compensation claim. We reverse and remand.

**I.**

[¶2.] Ginger Vollmer, a pharmacy technician, began working at Wal-Mart in 1992. By all accounts, she was an excellent employee. She was injured at work on September 1, 1999, when she crouched down beside a compact refrigerator to put away a small package of insulin vials. As she held the refrigerator door with her right hand, she reached across her body with the package in her left hand. It weighed less than sixteen ounces. She later testified that at this point she experienced severe pain and could not move her head or left arm. A co-worker assisted her. She left work to see a massage therapist, whom she had been seeing for recurrent headaches. Migraine headaches had been a longstanding problem for her.

[¶3.] Two days later, Vollmer visited her regular physician, Dr. Richard Beasley, an internist. She had previously seen him in April and May 1999 for headaches, fatigue, and chest wall pain. On this occasion, Dr. Beasley found no objective explanation for her condition. Nonetheless, he took her off work until September 27, 1999. She then returned to work at Wal-Mart part-time, four to five hours a day. This schedule was not set by any of her treating physicians but was based on what she thought she could physically handle. In October, she developed a

-1-

"popped out" rib that caused her significant pain, and she saw Dr. Blickensderfer, a chiropractor, for treatment.

[¶4.]     During two visits with Dr. Beasley in October 1999, Vollmer indicated that she was improving.  He expected her to be back to normal by November.  In November, however, her condition had only worsened.  Dr. Beasley sought a consultation with Dr. Lawlor, a physiatrist and rehabilitation specialist.  Dr. Lawlor diagnosed Vollmer with thoracic outlet syndrome and cervical, mechanical, and myofascial pain.[1]  Thoracic outlet compression syndrome is a "symptom complex characterized by brachial neuritis with or without vascular or vasomotor disturbance in the upper extremities."  Taber's Cyclopedic Medical Dictionary, 1726 (15th ed 1985).

[¶5.]     Beginning in December 1999, Vollmer saw Dr. Schabauer, a specialist in cardiology and vascular medicine.  He found "no clear evidence of a vascular cause for her pain."  He referred her to a pain clinic in Chicago where she stayed for a week.  In a letter dated March 16, 2001, one of the physicians at the Chicago clinic wrote:  "Our medical assessment is bilateral shoulder myofascial pain syndrome left side greater than right, left thoracic outlet syndrome secondary to poor posture and biomechanics."  Vollmer later saw other physicians for shoulder and arm pain, which she continued to attribute to the Wal-Mart incident.  During the course of her

---

1.     As of March 2000, Dr. Beasley indicated, "I do not believe thoracic outlet syndrome is the original diagnosis nor is it the active diagnosis at this time."  On being deposed, he maintained this opinion.  At the time of his deposition, Dr. Lawlor had not examined Vollmer for almost two years.

medical care over this extended period of time, Vollmer took physical therapy, massage therapy, chiropractic care, and medications to reduce her pain.

[¶6.]     Vollmer suffered additional trauma not connected with her employment. Nine days after the injury at Wal-Mart, she was involved in a car accident that caused a neck injury. It was disputed whether her increase in pain was temporary or permanent.[2] The medical records indicated that the accident resulted in a cervical strain escalating her previous symptoms.[3] There was also the "popped out rib" in October, mentioned earlier. On November 8, 2000, she was involved in another automobile accident. This one she characterized as a minor bump from behind.

[¶7.]     In May 2001, Vollmer began experiencing symptoms from Guillian-Barré Syndrome (GBS). GBS is a rare nerve disorder that causes progressive muscle weakness that sometimes results in paralysis. Vollmer eventually lost all feeling and control of her muscles and was hospitalized for a week. As a result of her acute GBS, she was unable to work at all for six months. She later testified that her GBS symptoms improved for the most part although she still experienced some pain in her extremities. This is consistent with medical opinion that GBS usually affects nerves in the extremities more severely. An EMG taken before the onset of her GBS but after the Wal-Mart incident was found to be normal. Another

---

2.     In her deposition, Vollmer testified that the car accident had exacerbated her condition, but she had recovered to "a certain extent."

3.     As of June 26, 2001, Dr. Beasley's notes indicate a "significant amount of complications that have occurred with a neck injury that occurred from a motor vehicle accident in the past."

one taken on June 19, 2001 yielded abnormal results. This latter EMG showed that nerve responses in Vollmer's arms were less than they should have been. Her medical records also noted ongoing residual pain from the GBS. According to her neurologist, Dr. Robert Finley, the normal course for GBS is to gradually improve over time until there are few, if any, symptoms remaining. He anticipated that Vollmer would follow a similar course. It is undisputed that the GBS was in no way related to the Wal-Mart incident.

[¶8.] Vollmer was discharged from Wal-Mart in March 2000. She had refused to sign a form placing her on an extended leave of absence. Thereafter, she obtained employment with Medicap Pharmacy where she continued to work four hour days. Vollmer testified that she enjoyed her work at Medicap and that they would accept her for more work hours. However, she felt that working more than four hours a day was too painful. After trying to work an extra hour one day, she had "raging" pain and could not continue. In explaining her daily routine, Vollmer testified that when she finishes work she runs errands, does household chores, and relaxes. Wal-Mart introduced a surveillance video showing Vollmer engaging in activities such as shopping, getting gas for her automobile, picking up her children, and other daily living tasks, all after her half-day at work.

[¶9.] Two of Vollmer's treating physicians testified that the incident at Wal-Mart was a major contributing cause of her current medical condition. On the other hand, Dr. Michael D. Smith, an independent medical examiner hired by the employer, testified that the incident at Wal-Mart was not a major contributing cause of her injuries. He found no reason she could not return to work full time. Dr. Smith believed that Vollmer suffered from chronic myofascial pain and her

subsequent complaints were not consistent with a particular traumatic event like the Wal-Mart incident.

[¶10.]     Vollmer's workers' compensation claim was initially accepted and benefits were paid.  A dispute later arose concerning whether the continued treatments were causally related to the Wal-Mart incident.  After a hearing, the Department ruled that Vollmer failed to prove a causal connection between her injury and her employment.  When the case moved to circuit court, Judge A.P. Fuller ordered that the matter be remanded to the Department for further findings on (1) causation, (2) Vollmer's credibility, and, if necessary, (3) the nature and extent of her disability.  Judge Fuller concluded that the Department's decision was erroneous because the Administrative Law Judge (ALJ) placed undue emphasis on Dr. Smith's independent medical examination and failed to make any determination on Vollmer's credibility.  Judge Fuller labeled as "simplistic" Dr. Smith's axiom for analyzing causation of pain:  "if you can't name it, you can't cut it."  Relying on this axiom, the ALJ found lack of causation because there were no objective medical findings to support Vollmer's complaints and her condition could have been the result of her GBS or her automobile accidents.

[¶11.]     On remand, the Department again ruled that the work related incident was not a major contributing cause of her current condition.  The Department also determined that Vollmer was not a credible witness because of inconsistencies between her reported disabilities and her activities as seen in the surveillance videos.  On the second appeal to circuit court, Judge James W. Anderson affirmed the Department.  In her appeal to this Court, Vollmer contends that her work injury was a major contributing cause of her current condition, that she is

permanently and totally disabled under the odd-lot doctrine, and that she is entitled to compensation for unpaid medical expenses.

## II.

[¶12.] In workers' compensation cases, our standard of review is controlled by SDCL 1-26-37. Witness credibility is a question of fact. Kuhle v. Lecy Chiropractic, 2006 SD 16, ¶15, 711 NW2d 244, 247 (citing Enger v. FMC, 1997 SD 70, ¶10, 565 NW2d 79, 83 (quoting Tieszen v. John Morrell & Co., 528 NW2d 401, 403-04 (SD 1995)). When an issue is a question of fact, then the clearly erroneous standard applies to the agency's findings. *Id.* We will reverse only when we are firmly convinced a mistake has been made. *Id.* (citing Gordon v. St. Mary's Healthcare Center, 2000 SD 130, ¶16, 617 NW2d 151, 157). Whether a claimant makes a prima facie case to establish odd-lot total disability inclusion is a question of fact. Lagge v. Corsica Co-op., 2004 SD 32, ¶14, 677 NW2d 569, 573 (citation omitted). All the medical testimony in this matter was provided by deposition. When an agency makes factual determinations on the basis of documentary evidence, such as depositions, the matter is reviewed de novo. Watertown Coop. Elevator Ass'n v. S.D. Dept. of Revenue, 2001 SD 56, ¶10, 627 NW2d 167, 171 (citations omitted). Accordingly, we consider anew the medical evidence on causation.

## III.

[¶13.] The primary question here is whether Vollmer's injury at Wal-Mart was a major contributing cause of her current condition. To prevail on a workers' compensation claim, a claimant must establish "a causal connection between [her] injury and [her] employment. That is, the injury must have its origin in the hazard

to which the employment exposed the employee while doing [her] work." Rawls v. Coleman-Frizzell, Inc., 2002 SD 130, ¶20, 653 NW2d 247, 252 (citation omitted) (alteration in *Rawls*). Employees need not prove that their employment activity was the proximate, direct, or sole cause of their injury, only that the injury arose "out of and in the course of employment." SDCL 62-1-1(7).[4] And, an injury is not "compensable unless the employment or employment related activities are a major contributing cause of the condition complained of[.]" SDCL 62-1-1(7)(a); Caldwell v. John Morrell & Co., 489 NW2d 353, 358 (SD 1992) (citations omitted).

[¶14.]     This Court has often acknowledged that in cases like these, the testimony of medical professionals is crucial in establishing that a claimant's injury is causally related "to the injury complained of 'because the field is one in which [laypersons] ordinarily are unqualified to express an opinion.'" *Rawls*, 2002 SD 130 ¶21, 653 NW2d at 252 (quoting Day v. John Morrell & Co., 490 NW2d 720, 724 (SD 1992)). Indeed, SDCL 62-1-1(7) requires "medical evidence." "The evidence necessary to support an award must not be speculative, but rather must be 'precise and well supported.'" Horn v. Dakota Pork, 2006 SD 5, ¶14, 709 NW2d 38, 42 (citations omitted). A claimant "must establish by a preponderance of the evidence that the injury 'arose out of the course of [her] employment and that [her]

---

4.     SDCL 62-1-1(7) provides in relevant part:

"Injury" or "personal injury," only injury arising out of and in the course of the employment, and does not include a disease in any form except as it results from the injury. An injury is compensable only if it is established by medical evidence, subject to the following conditions:

(continued . . .)

employment was a major contributing cause of [her] condition or [her] disability, impairment or need for treatment.'" *Byrum v. Dakota Wellness Foundation*, 2002 SD 141, ¶18, 654 NW2d 215, 219 (citation omitted) (alteration in *Byrum*). Even if there is no dispute that a claimant "suffered an initial work-related injury, that injury does not automatically establish entitlement to benefits for her current claimed condition." *Haynes v. Ford*, 2004 SD 99, ¶17, 686 NW2d 657, 661 (emphasis omitted). Rather, a claimant must establish that such injury "became a major contributing cause of her *current* claimed *condition*." *Id*.

**IV.**

[¶15.]      Because we review de novo the medical testimony in this case, we detail here the salient medical opinions presented by both sides. Dr. Brett Lawlor, a board certified physiatrist, described Vollmer's history: she was kneeling down at work to put some insulin back in the refrigerator and then she felt a shooting pain or sensation in her left arm. When he saw her in December 1999, her shoulder and arm symptoms had stayed mostly the same. It had improved twenty-five percent, at most. It was his impression that she did not have "a vascular but a neurogenic thoracic outlet syndrome," so the tests that could establish a vascular thoracic outlet syndrome were not done. He said, "literally every musculoskeletal textbook that you can look in will discuss this diagnosis, how to arrive at the diagnosis, the

_____

(. . . continued)

      (a)     No injury is compensable unless the employment or employment related activities are a major contributing cause of the condition complained of[.]

different physical exam techniques. It is not an area, with specialists in my area, a remotely controversial diagnosis."

[¶16.] Although Dr. Lawlor conceded that there was no objective evidence to explain her complaints of ongoing pain in her left arm and neck, he explained that there were semi-objective indications. He said that such indications would come from having her perform movements and if she reported pain, they would have to make "sense to me from a physiologic or anatomic standpoint." His diagnosis for her was "neurogenic thoracic outlet syndrome and cervical, mechanical, and myofacial pain with left radicular pain." He testified that "the diagnosis is essentially irritation of the nerves in the brachial plexus from tight muscles in the front of the neck." He explained that "myofacial pain means muscle pain."

[¶17.] Dr. Lawlor testified that the duties of a pharmacy tech include repetitive use of the upper extremities at or above the shoulder level. He believed that the injury she described was the cause of her symptoms. Her activity was "consistent with the type of activity that precipitates the injury for which she had and the symptoms for which she presented." It was his opinion to a reasonable degree of medical probability that her thoracic outlet syndrome was a permanent condition. He said it was not uncommon for someone who carries the diagnosis of thoracic outlet syndrome to have very little in the way of objective medical findings to substantiate the diagnosis. He said that over ninety percent of patients suffering from this syndrome will not have an objective test to establish the diagnosis. He concluded that she was not malingering or overstating her symptoms.

[¶18.] Dr. Lawlor testified that the conclusions reached at the Rehabilitation Institute of Chicago were very similar to his own. In his deposition, he read those

conclusions: "our medical assessment is bilateral shoulder myofacial pain syndrome, left side greater than right, left thoracic outlet syndrome, secondary to poor posture and biomechanics. And as I testified, she had cervical, mechanical, and myofacial pain and thoracic outlet syndrome." He explained that Dr. Schabauer's conclusion that there was not a thoracic outlet syndrome was based upon a test called the "Addison's maneuver." Dr. Lawlor said that Dr. Schabauer is a vascular specialist and that his diagnosis was concerning *vascular*, not *neurogenic*, thoracic outlet syndrome. Dr. Lawlor agreed with Dr. Schabauer that Vollmer did not have *vascular* thoracic outlet syndrome. He also agreed with the Rehabilitation Institute of Chicago that poor posture and biomechanics are contributing factors for the development of thoracic outlet syndrome.

[¶19.] Dr. Craig Mills, a board-certified physical medicine and rehabilitation specialist, saw Vollmer in the spring of 2002 on several occasions. He first saw her at the Black Hills Rehabilitation Hospital where she was a patient from June 26 through July 3, 2001, in connection with her GBS. He later diagnosed her with "left shoulder girdle myofacial pain syndrome." At his deposition, he testified that he would not give her, "as a classic diagnosis," the diagnosis of thoracic outlet syndrome. He did not feel that she had been successfully treated for her myofacial pain symptoms. He tried injections, physical therapy, and various medications. She had minimal response to these efforts. Based on his continuing work with her and considering her consistent complaints about her left shoulder and radiating pain with associated headaches, he concluded that the injury she described at work was "consistent with the citing etiology."

[¶20.] Despite the automobile accidents that she was involved with, based upon his examinations, Dr. Mills testified that "I would still say that the work injury is the primary etiology." Although he never diagnosed her with having thoracic outlet syndrome, his impression was that she "had cervico-thoracic pain in the scapular-thoracic area." He could not identify the "actual vital mechanism over pain in the cervical-thoracic area." He found some narrowing in the nerve roots that may be the etiology based on earlier MRI studies. In his experience with these types of patients, Dr. Mills said that they may continue working but they may have some limitations. In Vollmer's case he said, "she appears to have significant limitations because I think about a set number of hours brings about onset of pain." Dr. Mills never set limitations for her, however. He concluded that "her syndrome has persisted for a chronic period of time and likely will be permanent." Dr. Mills explained that "many times there may not be objective tests substantiating" the complaints of those who suffer from myofacial pain syndrome.

[¶21.] Dr. Michael D. Smith, a board certified orthopedic surgeon who practices in Minneapolis, examined Vollmer on behalf of the employer. He traveled to Rapid City to perform his independent medical exam in July 2002. Ultimately, Dr. Smith concluded that it was difficult to attach any significance to either Vollmer's motor vehicle accident or the "strain" at Wal-Mart, both of which occurred in September 1999. He said that although Vollmer described the automobile accident as extremely minor, her medical records suggested otherwise. In any event, he found no objective permanent residuals as a consequence of either the automobile accident or the Wal-Mart incident. His impression: "1. chronic pain syndrome; 2. Status post Gillain-Barré Syndrome." Because Vollmer did not have a

specific diagnosis, Dr. Smith thought it "inappropriate to assign significant permanent objective restrictions based on subjective criteria alone." He agreed with Dr. Schabauer that there was no evidence of thoracic outlet syndrome and there was no objective evidence of orthopedic musculoskeletal injury. He found no orthopedic basis for restricting her to lighter duty work or to a thirty-hour work week. He conceded, however, that the muscle spasm and atrophy that Dr. Schabauer found would be considered objective findings.

[¶22.] Dr. Smith's surgical practice is restricted to the operative treatment of cervical spine disorders. Two thirds of the patients he sees with head, neck, and upper extremity shoulder pain do not receive operations. Thus, the bigger portion of his practice is the non-operative evaluation and treatment of these individuals. However, he indicated that often when he finds that surgery is not the appropriate treatment for a patient, he will refer them to a physiatrist, like Dr. Lawlor. Dr. Smith would only go so far as to say that Vollmer suffers from chronic myofacial pain. He conceded that there was no medical basis for concluding that Vollmer was exaggerating or malingering.

## V.

[¶23.] In the end, it must be acknowledged that the medical testimony from the doctors was divergent on a single diagnosis. The case is complicated by the fact that Vollmer has suffered from so many different medical ailments and several traumas. On the question of her present condition, Dr. Mills and Dr. Lawlor, two of Vollmer's treating physicians, concurred that she suffers from a permanent chronic pain syndrome. With Dr. Lawlor, the diagnosis was neurogenic thoracic outlet

syndrome; with Dr. Mills, the diagnosis was left shoulder girdle myofascial pain syndrome. Both agreed that her work place injury was a major contributing cause of her present condition. They acknowledged, though, that this condition could not be verified by objective findings. Nonetheless, their diagnoses are recognized maladies in medical science. Simply because an ailment does not manifest objective evidence does not mean it does not exist. Dr. Schabauer, another of Vollmer's treating physicians, a specialist in cardiology and vascular medicine, testified that he found a considerable amount of muscle spasm and muscle atrophy in the areas where Vollmer was complaining of pain. He considered this an objective finding, but he did not diagnose *vascular* thoracic outlet syndrome.

[¶24.] Dr. Smith, on the other hand, concluded that without objective findings, a diagnosis could not be made. He testified that "the primary rule of surgery and in medicine is if you can't name it, you can't cut it. In her case, she doesn't have a specific diagnosis." However, he agreed that Dr. Schabauer did make some objective findings: muscle spasm and atrophy. Furthermore, Dr. Lawlor, the physiatrist, testified that over ninety percent of the patients he has treated with thoracic outlet syndrome have only these "semi-objective" findings. Dr. Mills, whose diagnosis was myofacial pain syndrome, testified that there may not be objective tests substantiating the complaints of patients who suffer from this syndrome.

[¶25.] Our law does not require objective findings in order to sustain a workers' compensation claim. SDCL 62-1-15 only provides that "[i]n any proceeding or hearing pursuant to this title, evidence concerning any injury shall be given greater weight if supported by objective medical findings." This does not

necessarily lead to the conclusion that a medical opinion without objective findings should be given no weight.

[¶26.] The Department relied, in part, on the testimony of Dr. Finley, the physician who treated Vollmer for her GBS. He testified at one point that he did not believe that the Wal-Mart incident of September 1, 1999 remained a major contributing cause of her present symptoms. The ALJ then concluded that the "opinion of Dr. Finley, when considered in conjunction with Dr. Smith's opinion, compels the conclusion that the September 1, 1999, incident at Wal-Mart no longer is a major contributing cause of claimant's current alleged inability to work." Yet, later in his deposition, Dr. Finley testified that his opinions were limited to addressing the effect of GBS on Vollmer's condition. He said that he had no opinion on her thoracic outlet syndrome or her myofascial pain, and he would defer those questions to Dr. Mills. Indeed, Dr. Finley never treated her for the symptoms related to the September 1, 1999 incident. Thus, the ALJ's reliance on Dr. Finley was problematic.

## VI.

[¶27.] We make the following conclusions from our review of the record: (1) The shoulder and arm problems that Vollmer presently complains of began with her trauma on September 1, 1999, at her place of employment, and they have not changed appreciably since that time. (2) Mel Henrichson, Vollmer's supervisor at Wal-Mart, described her as "the most capable pharmacy tech I have ever worked with." He has been a pharmacist for thirty-seven years and supervised many pharmacy technicians. Henrichson witnessed her trauma on September 1, 1999.

He saw that she could not move her head and left arm and that she appeared to be in pain. (3) All the physicians who examined her agree that she is presently suffering pain in the same area of her body where she first experienced her trauma at Wal-Mart. Also, all agree that she is not exaggerating her pain symptoms or malingering. With respect to the question of malingering, even Dr. Smith, the employer's independent medical examiner, said that "from an orthopedic perspective I have no information that is happening." Dr. Smith also agreed that she is suffering from "chronic myofascial pain." His disagreement centered on causation. (4) Despite her pain, she continues to work in her field part time and to perform all the chores expected of a wife and mother. (5) The surveillance videos do not prove that she lied about her disabilities. She never denied that she could perform the acts she is seen doing on the tapes. She only said that the pain increases as she continues to do them, and to alleviate the pain she must rest or not perform the activities. Even if the ALJ believed that the surveillance videos show that she exaggerated her symptoms, this pertains more to the extent of her disability, rather than the question of causation. After all, it is undisputed that she suffered a traumatic incident while on the job at Wal-Mart. (6) Although no doctor specifically gave her a half-day limit on working, a least one of her doctors concurred with this self-imposed limitation. (7) Simply because medical testimony is divergent is not a reason in itself to conclude that a claimant has failed to prove medical causation.

[¶28.] The deeper question here is not just whether Vollmer suffers pain, but whether her credible subjective medical problems prevent her from performing more than four or five hours of work each day. This issue was answered by the ALJ

with a finding that Vollmer was not credible. On the credibility question, however, we are struck with the fact that in most of her doctor visits Vollmer was not seeking authentication for a disability claim. She was seeking only to alleviate her pain. Her trip to the pain clinic in Chicago was at her own expense and she went there apparently to resolve her pain. Except when she was taken off work by her physician and when she suffered from GBS, she has continued to work, and she has continued to do all the activities of a mother, wife, and homemaker. The only basis for finding that she was not credible was the ALJ's viewing of the surveillance videos and the inconsistencies in her medical records, which the ALJ never detailed. Nor did the ALJ explain precisely what he saw in the videos that contradicted her testimony or the testimony of her physicians.

[¶29.]     Indeed, the surveillance videos do not prove that she does not feel pain or that the pain does not increase as the day goes by. To rule that the videos establish such a conclusion runs directly against unanimous medical opinion. All the doctors agreed that she suffers pain from her condition and is not exaggerating or malingering. She is disabled in the sense that pain hampers her mobility and endurance; it does not preclude her from performing her duties. Thus, to make the precipitate conclusion that she is not suffering as she claims and is therefore not credible is unwarranted on this record. Credibility cannot be invoked like an incantation to dismiss a claimant's case in the face of competent medical opinion that her pain is a reality. Here, the ALJ found that "[d]ue to numerous inconsistencies in claimant's reported complaints in the medical records, in her testimony, and in the behavior which was noted during the surveillance, Vollmer is not a credible witness as to her physical condition, her ability to work, or her claim

of total disability." But the ALJ did not document the inconsistencies he found in her medical records, making it difficult for us to verify this conclusion. Credibility is a question for the fact finder to whom we ordinarily defer, but when an ALJ discredits a claimant's testimony without giving a factual explanation for it, one that is supported in the record, we cannot defer to such a finding.

[¶30.] We conclude that Vollmer has established by a preponderance of the evidence that her incident at Wal-Mart was a major contributing cause of her current claimed condition. From our de novo review of the depositions, we conclude that the physicians testifying on Vollmer's behalf were more persuasive on the question of causation. The Department's findings on Vollmer's credibility were clearly erroneous. Because the ALJ discounted the extent of her disability with an erroneous finding on credibility, the case must be remanded for further findings on the precise extent of her work-related disability and a reexamination of her claimed medical expenses.

[¶31.] Reversed and remanded.

[¶32.] GILBERTSON, Chief Justice, and SABERS, ZINTER, and MEIERHENRY, Justices, concur.